## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### CASE NO.

SECURITIES AND EXCHANGE COMMISSION,

Plaintiff,

**16-21301**

v.

ARIEL QUIROS,
WILLIAM STENGER,
JAY PEAK, INC.,
Q RESORTS, INC.,
JAY PEAK HOTEL SUITES L.P.,
JAY PEAK HOTEL SUITES PHASE II L.P.,
JAY PEAK MANAGEMENT, INC.,
JAY PEAK PENTHOUSE SUITES L.P.,
JAY PEAK GP SERVICES, INC.,
JAY PEAK GOLF AND MOUNTAIN SUITES L.P.,
JAY PEAK GP SERVICES GOLF, INC.,
JAY PEAK LODGE AND TOWNHOUSES L.P.,
JAY PEAK GP SERVICES LODGE, INC.,
JAY PEAK HOTEL SUITES STATESIDE L.P.,
JAY PEAK GP SERVICES STATESIDE, INC.,
JAY PEAK BIOMEDICAL RESEARCH PARK L.P.,
AnC BIO VERMONT GP SERVICES, LLC,

**Defendants, and**

JAY CONSTRUCTION MANAGEMENT, INC.,
GSI OF DADE COUNTY, INC.,
NORTH EAST CONTRACT SERVICES, INC.,
Q BURKE MOUNTAIN RESORT, LLC,

**Relief Defendants.**

_____/

FILED by ___ D.C.

APR 1 2 2016

STEVEN M. LARIMORE
CLERK U.S. DIST. CT.
S. D. of FLA. – MIAMI

MAGISTRATE JUDGE
TURNOFF

RECEIVED
BURLINGTON, VT

APR 2 0 2016
2:16-mc-45
CLERK'S OFFICE
U.S. DISTRICT COURT

### COMPLAINT FOR INJUNCTIVE AND OTHER RELIEF

Plaintiff Securities and Exchange Commission alleges as follows:

### I. INTRODUCTION

1.    This is an emergency action the Commission is bringing to stop an ongoing,

Certified to be a true and
correct copy of the document on file
Steven M. Larimore, Clerk,
U.S District Court
Southern District of Florida
By _____
Deputy Clerk
Date  4/14/2016

massive eight-year fraudulent scheme in which the Miami owner and the chief executive of a Vermont ski resort have systematically looted more than $50 million of the more than $350 million that has been raised from hundreds of foreign investors through the U.S. Citizenship and Immigration Service's EB-5 Immigrant Investor Program.

2.      The fraudulent scheme spans seven limited partnership securities offerings all connected to Jay Peak, Inc., a Vermont ski resort that is wholly owned by Miami-based Q Resorts, Inc., which in turn is owned by Miami businessman Ariel Quiros.  Quiros and William Stenger, the president and CEO of Jay Peak, are primarily responsible for the fraudulent scheme.

3.      Among other things, Quiros, Stenger, and the companies they run that have overseen the development and construction of the Jay Peak resort have misused more than $200 million – more than half of all money raised from investors.  Quiros orchestrated and Stenger facilitated an intricate web of transfers between the various Defendants and Relief Defendants to disguise the fact that the majority of the seven projects were either over budget or experiencing shortfalls. These shortfalls were due in large part to Quiros pilfering tens of millions of dollars of investor money for his own use.

4.      Since 2008, Quiros has misappropriated more than $50 million in investor money to, among other things: (1) finance his purchase of the Jay Peak resort; (2) back a personal line of credit to pay his income taxes; (3) purchase a luxury condominium; (4) pay taxes of a company he owns; and (5) buy an unrelated resort.  He improperly used additional investor funds to pay down and pay off margin loans (including paying nearly $2.5 million in margin interest) he set up in the name of the Defendant companies at a brokerage firm.

5.      The EB-5 investment program gives foreign investors the chance to earn permanent residence in the United States through investing in U.S. projects that create a certain

2

number of jobs. Quiros, Stenger, and the other Defendants made numerous misrepresentations and material omissions to these foreign investors. Among them were telling investors the Defendants would only use investor money to finance the specific project to which each investor contributed. The Defendants further assured investors that Stenger, the *de facto* general partner for the first six projects, had control of investor funds. In reality, Stenger extremely recklessly ceded control of investor funds to Quiros. He did almost nothing to manage investor money, even when confronted with red flags of Quiros' misuse.

6.     The first six projects for which the Defendants raised money were all part of a ski resort and accompanying facilities located near Jay, Vermont. The most recent project, for which the Defendants continue to raise money from unwitting investors, purports to be for a nearby $110 million biomedical research center that the Defendants have operated as nearly a complete fraud. The offering documents the Defendants are providing to investors in that project are rife with material misstatements and omissions. These include bogus claims that the Defendants are in the process of obtaining Food and Drug Administration approval for the research center's products. In reality, the Defendants have not undertaken the necessary steps to begin the lengthy and cumbersome process of getting FDA approval. Further exacerbating their misstatements, the Defendants have baselessly projected hundreds of millions of dollars in revenue from the research center – projections based on FDA approval they have done virtually nothing to obtain.

7.     As a result, although the Defendants have raised almost three-quarters of the money for the research facility, they have done almost no work on it other than site preparation and ground-breaking, and are years behind their original construction and revenue schedule. Quiros has secretly used most of the money raised for the research facility's construction to pay

3

off and pay down a margin loan and to misappropriate approximately $30 million for his own use.

8.     As a consequence of the Defendants' systematic misuse of investor funds from the various Jay Peak projects, there is little money left in any of the research facility's accounts to pay for its construction.  Similarly the sixth project, part of the ski resort, is nowhere near completion and out of money.  Investors in those projects, who contributed $500,000 each, are in grave danger of losing their investments and having their immigration petitions denied.

9.     The Defendants apparently are hoping to fund remaining construction of the sixth and seventh projects through ongoing efforts to raise money from new investors – both in the biomedical research facility and in additional EB-5 projects Quiros is attempting to start.  To stop the Defendants' illegal course of conduct and prevent further fraud on investors, the Commission is bringing this action and seeking emergency relief, among other remedies.

10.     Through their conduct, the Defendants have each violated Section 17(a) of the Securities Act of 1933 ("Securities Act"), and Section 10(b) and Rule 10b-5 of the Securities Exchange Act of 1934 ("Exchange Act").  In addition, Quiros violated Section 20(a) of the Exchange Act and he and Q Resorts aided and abetted violations of Section 10(b) and Rule 10b-5(b) of the Exchange Act.  The Commission is seeking several forms of relief, including simultaneous emergency relief of temporary restraining orders, asset freezes, appointment of a Receiver, and sworn accountings.  The Commission also seeks preliminary and permanent injunctions and civil money penalties against all the Defendants, and disgorgement of ill-gotten gains against the Defendants and Relief Defendants.

## II.  DEFENDANTS AND RELIEF DEFENDANTS

### A.  Defendants

4

11.    **Jay Peak** is a Vermont corporation with its principal place of business in Jay, Vermont.  Jay Peak operates the Jay Peak Resort in Jay, Vermont, which encompasses the first six projects for which the Defendants raised money.  Jay Peak, in conjunction with others, has served as the manager or developer of the projects.

12.    **Q Resorts** is a Delaware corporation with its offices in Miami, Florida.  Q Resorts is the 100 percent owner of Jay Peak, and Quiros is the sole owner, officer and director of Q Resorts.  Q Resorts acquired Jay Peak from a Canadian firm in 2008, and Quiros has since overseen the various Jay Peak projects through Q Resorts.

13.    **Quiros**, 58, resides in Key Biscayne, Florida.  In addition to being the sole owner, officer and director of Q Resorts, he is chairman of Jay Peak.  Through those two companies, Quiros controlled each of the Defendant general and limited partnerships.  He is a principal of the general partner of the Jay Peak Biomedical limited partnership offering, which is the seventh and most recent project offering.  Between February and April 2011, Quiros served on the board of directors of Bioheart, Inc., a publicly-traded company.

14.    **Stenger**, 66, resides in Newport, Vermont.  Stenger is the Director, President, and CEO of Jay Peak.  He is the president and director of the general partner of the first Jay Peak project offering, and is the sole officer or director of the general partner of the second through sixth offerings.  All six offerings were set up as limited partnerships.  Stenger is, along with Quiros, a principal in the Jay Peak Biomedical general partner.

15.    **Jay Peak Hotel Suites L.P.** ("Suites Phase I") is a Vermont limited partnership with its principal place of business in Jay, Vermont.  Between December 2006 and May 2008, Suites Phase I raised $17.5 million from 35 investors through an EB-5 offering of limited partnership interests to build a hotel.  The hotel is completed and operating.

5

16. **Jay Peak Hotel Suites Phase II L.P.** ("Hotel Phase II") is a Vermont limited partnership with its principal place of business in Jay, Vermont. Between March 2008 and January 2011, Hotel Phase II raised $75 million from 150 investors through an EB-5 offering of limited partnership interests to build a hotel, an indoor water park, an ice rink, and a golf club house. Construction on all is complete and they are operating.

17. **Jay Peak Management, Inc.** is a Vermont corporation which is the general partner of Suites Phase I and Hotel Phase II. It is also a wholly-owned subsidiary of Jay Peak. Stenger is the company's president.

18. **Jay Peak Penthouse Suites L.P.** ("Penthouse Phase III") is a Vermont limited partnership with its principal place of business in Jay, Vermont. Between July 2010 and October 2012, Penthouse Phase III raised $32.5 million from 65 investors through an EB-5 offering of limited partnership interests to build a 55-unit "penthouse suites" hotel and an activities center, including a bar and restaurant. Construction is complete and the facilities are operating.

19. **Jay Peak GP Services, Inc.** is a Vermont corporation and the general partner of Penthouse Phase III. Stenger, listed as the director, is its only principal.

20. **Jay Peak Golf and Mountain Suites L.P.** ("Golf and Mountain Phase IV") is a Vermont limited partnership with its principal place of business in Jay, Vermont. Between December 2010 and November 2011, Golf and Mountain Phase IV raised $45 million from 90 investors through an EB-5 offering of limited partnership interests to build "golf cottage" duplexes, a wedding chapel, and other facilities. Construction is complete, and the facilities are operating.

21. **Jay Peak GP Services Golf, Inc.** is a Vermont corporation and the general partner of Golf and Mountain Phase IV. Stenger, listed as the director, is its only principal.

6

22.     **Jay Peak Lodge and Townhouses L.P.** ("Lodge and Townhouses Phase V") is a Vermont limited partnership with its principal place of business in Jay Vermont.  Between May 2011 and November 2012, Lodge and Townhouses Phase V raised $45 million from 90 investors through an EB-5 offering of limited partnership interests to build 30 vacation rental townhouses, 90 vacation rental cottages, a café, and a parking garage.  Construction is complete and the facilities are operating.

23.     **Jay Peak GP Services Lodge, Inc.** is a Vermont corporation and the general partner of Lodge and Townhouses Phase V.  Stenger, listed as the director, is its only principal.

24.     **Jay Peak Hotel Suites Stateside L.P.** ("Stateside Phase VI") is a Vermont limited partnership with its principal place of business in Jay, Vermont.  Between October 2011 and December 2012, Stateside Phase VI raised $67 million from 134 investors through an EB-5 offering of limited partnership interests to build an 84-unit hotel, 84 vacation rental cottages, a guest recreation center, and a medical center.  Although the Stateside Phase VI offering was fully subscribed, the Defendants have only built the hotel.  A small amount of work has been done on building the cottages and work has not yet begun on the recreation and medical centers.

25.     **Jay Peak GP Services Stateside, Inc.** is a Vermont corporation and the general partner of Stateside.  Stenger, listed as the director, is its only principal.

26.     **Jay Peak Biomedical Research Park L.P.** ("Biomedical Phase VII") is a Vermont limited partnership with its principal place of business in Newport, Vermont.  Since November 2012, Biomedical Phase VII has raised approximately $83 million from 166 investors through an EB-5 offering of limited partnership interests to construct a biomedical research facility.  Other than site preparation and groundbreaking, no work has been done on the facility. The Defendants seek to raise approximately another $27 million from 54 investors, which,

7

because of the misuse and misappropriation of funds, will not be enough to finance construction of the research facility.

27.     **AnC Bio Vermont GP Services, LLC** is a Vermont limited liability company and the general partner of Biomedical Phase VII. Its managing members are Quiros and Stenger.

### B. Relief Defendants

28.     **Jay Construction Management, Inc.** ("JCM") is a Vermont corporation with its offices in Miami, Florida, at the same address as Q Resorts. Its status is listed as terminated as of March 16, 2016. Quiros is the sole officer and director of JCM. Quiros funneled more than $160 million of investor funds from several projects through JCM and its bank accounts, and entered into contracts with outside vendors for construction of some of the Jay Peak projects. He also used misused tens of millions of dollars of the funds JCM received. Quiros controlled JCM's bank accounts. Without any legitimate basis, JCM received investors' proceeds emanating from the Defendants' securities fraud.

29.     **GSI of Dade County, Inc.** ("GSI") is a Florida corporation with its offices in Miami at the same address as Q Resorts and JCM. Quiros is the owner and sole officer and director of GSI. GSI received more than $13 million of investor money emanating from Biomedical Phase VII investor funds. Without any legitimate basis, GSI received investors' proceeds emanating from the Defendants' securities fraud.

30.     **North East Contract Services, LLC** ("Northeast") is a Florida limited liability company formed in February 2013 and headquartered in Weston, Florida. Northeast acts as project manager for Biomedical Phase VII. William Kelly, who is Jay Peak's COO and a longtime business associate of Quiros, is the managing principal of Northeast. Northeast received at least $7.9 million of Biomedical Phase VII investor funds (in turn, Northeast paid

approximately $5.5 million of these funds to GSI for purported supervision fees on approximately $47 million of expenses that JCM purportedly was going to pay on behalf of Biomedical Phase VII. In reality, the Defendants paid less than $10 million of Biomedical Phase VII expenses with the approximately $47 million JCM received from Biomedical Phase VII. Quiros misused and misappropriated the vast majority of the remaining more than $37 million of Biomedical Phase VII investor funds that JCM received. Hence, Northeast received construction supervision fees for work that was not performed. Without any legitimate basis, Northeast received investors' proceeds emanating from the Defendants' securities fraud.

31. **Q Burke Mountain Resort, LLC** ("Q Burke") is a Florida limited liability company formed in April 2012 and headquartered in Miami at the same address as Q Resorts. Quiros is the managing principal of Q Burke. Q Burke is also the owner of the Burke Mountain Resort located in East Burke, Vermont, which is the site of another EB-5 offering that Quiros is promoting called Q Burke Mountain Resort. As described below, Quiros improperly used approximately $7 million from a margin loan backed by investor funds to purchase Q Burke. He subsequently used approximately $18.2 million of Biomedical Phase VII investor funds as part of the $19 million pay off of this margin loan. Without any legitimate basis, Q Burke received investors' proceeds emanating from the Defendants' securities fraud.

### III. JURISDICTION AND VENUE

32. The Court has jurisdiction over this action pursuant to Sections 20(b), 20(d), and 22(a) of the Securities Act, 15 U.S.C. §§ 77t(b), 77t(d), and 77v(a); and Sections 21(d), 21(e), and 27 of the Exchange Act, 15 U.S.C. §§ 78u(d), 78u(e), and 78aa.

33. This Court has personal jurisdiction over the Defendants and venue is proper in the Southern District of Florida for several reasons. Q Resorts, which owns Jay Peak and as a

result oversees the Jay Peak projects, is located in Miami. Quiros, who orchestrated the fraudulent scheme and through Q Resorts controls the general partner and limited partnerships in all Jay Peak offerings, resides and works in the Miami area. Stenger and the other Jay Peak employees all take direction from Quiros. Several of the companies through which Quiros orchestrated the fraud and through which he funneled money, including JCM, GSI, Northeast, and Q Burke, are located in South Florida.

34.     In addition, the Raymond James & Associates, Inc. ("Raymond James") account executive and brokerage office through which Quiros opened the Raymond James accounts used to perpetrate the fraud were located in Coral Gables, Florida. While investor money was first deposited in an escrow account for each project at a Vermont bank, it was soon after transferred to a corresponding Raymond James account through the brokerage office located in Coral Gables. Quiros and Stenger had numerous communications with the Raymond James broker located in Coral Gables, including emails, letters, wires, and telephone calls.

35.     Furthermore, Kelly, Jay Peak's COO, is located in South Florida. Other key Jay Peak employees spent significant time in South Florida during the time period alleged in this Complaint. A number of investors who received green cards also have settled in the Southern District, including at least 22 investors in Hotel Phase II, eight in Penthouse Phase III, 19 in Golf and Mountain Phase IV, 11 in Lodge and Townhouses Phase V, 17 in Stateside Phase VI, and seven in Biomedical Phase VII.

36.     The Defendants, directly and indirectly, made use of the means and instrumentalities of interstate commerce, and the mails, in connection with the acts, practices, and courses of business set forth in this Complaint.

## IV.  THE EB-5 PROGRAM

10

37.     Congress created the EB-5 Immigrant Investor Program in 1990 in an effort to boost the U.S. economy.  The Program provides a prospective immigrant with the opportunity to become a permanent resident by investing in the U.S.

38.     To qualify for an EB-5 visa, a foreign applicant must invest $500,000 or $1 million (depending on the type of investment) in a commercial enterprise approved by the U.S. Citizenship and Immigration Service ("Immigration Service").  Once he or she has invested, the foreign applicant may apply for a conditional green card, which is good for two years.  If the investment creates or preserves at least ten jobs during those two years, the foreign applicant may apply to have the conditions removed from his or her green card.  The applicant can then live and work in the U.S. permanently.

39.     A certain number of EB-5 visas are set aside for prospective immigrants who invest through what is known as a Regional Center.  An applicant only has to invest $500,000 if he or she invests through a Regional Center.

40.     The State of Vermont EB-5 Regional Center has been a federally-designated Regional Center since 1997.  Prospective immigrants investing through the Vermont Regional Center only have to invest $500,000.  As the Regional Center, the state has approved all EB-5 projects within the state and has entered into a memorandum of understanding with the issuers of EB-5 projects, including Jay Peak.  The Vermont Agency of Commerce and Community Development has, until recently, administered the state's EB-5 program.  The Vermont Division of Financial Regulation now shares that responsibility with the Agency.

## V. THE JAY PEAK EB-5 OFFERINGS

41.     Jay Peak began offering and selling securities in the form of limited partnership interests in December 2006.  Since that time it has raised more than $350 million from more than

700 investors from at least 74 countries in seven separate offerings. The individual offerings are set forth in Paragraphs 15, 16, 18, 20, 22, 24, and 26 above. While Biomedical Phase VII involves construction of the biomedical research facility, the first six limited partnership offerings have centered around a ski resort and related facilities, such as hotels, lodges, condominiums, recreation and meeting facilities, and restaurants and cafes.

42.     Jay Peak has marketed its EB-5 limited partnership interests and solicited investors in a variety of ways – through its website, intermediaries who have promoted the investments, immigration attorneys with interested clients, and overseas meetings and seminars with prospective investors.

43.     For example, Jay Peak has routinely attended events overseas where company representatives, including Stenger, have spoken and met with prospective investors. In addition, Jay Peak has sponsored booths and spoken at immigration-related conferences and events, both in the U.S. and abroad. Stenger has met in person with about 95 percent of the investors in the Jay Peak projects, and Quiros in recent years also has attended Jay Peak meetings with investors and answered their questions.

44.     While foreign residents are interested in investing to obtain their permanent green cards, they also are interested in achieving a return on their investment. Stenger has told investors he anticipated the individual projects would each make a two to six percent annual return once they were each complete and operating. In addition, the offering materials the Defendants provided to investors have touted their potential returns. For example, one Stateside investor received information from Jay Peak in the Stateside Phase VI offering materials stating that once the project is complete, investors will realize up to a six percent annual return. A Biomedical Phase VII investor received materials stating a five percent annual return is expected.

Other Biomedical Phase VII investors also received offering documents touting a four to six percent annual return once the project is built.

45.    Interested investors in each of the partnerships generally put down a $10,000 deposit, which goes towards their $500,000 investment.  The investors then normally receive from Jay Peak, and often from Stenger, offering materials that consist of a private placement memorandum, a business plan, and a limited partnership agreement.

46.    Among the documents included in each business plan is one showing the cost of each project and the use of investor funds.  Given different titles, such as "Source and Use of Investor Funds" (Suites Phase I), "Projected Sources and Uses of Funds" (Biomedical Phase VII), or "Investor Funds Source and Application" (Penthouse Phase III), this use of proceeds document lists in great detail exactly how Jay Peak and/or the limited partnership intend to spend all investor funds raised, including on land acquisition, site preparation, and construction.  The use of proceeds document also lists the management contribution in each offering, and how Jay Peak or the limited partnership will spend that money.  The document also spells out exactly how much in construction, management, land, or other fees Jay Peak and the general partner are entitled to take from investor money in each offering.

47.    So, for example, in Suites Phase I, the document entitled "Source and Use of Investor Funds" shows the project raising $17.5 million from investors to pay for the project.  The costs are then broken down as $10.4 million for construction, $1.6 million for operating systems and equipment, $800,000 for utilities and common areas, $1.8 million for purchase of the land, approximately $600,000 for contingencies, and approximately $400,000 for working capital.  Upon completion of the project, Jay Peak is entitled to take $1.9 million in developer fees, for a total of $17.5 million.

13

48.     An additional part of the offering materials is the limited partnership agreement in each project, which spells out the rights, obligations and responsibilities of the general partner for each project as well as the limited partners (investors). In each project through Stateside Phase VI, the general partner is an entity in which Stenger is the sole principal. In Biomedical Phase VII, Stenger and Quiros are both principals in the general partner.

49.     Among other key provisions, each limited partnership agreement – which all investors either signed or adopted – contains several provisions regarding how Jay Peak and the general partner can use investor money. Generally, each limited partnership agreement prevents the general partner from, without consent of the limited partners: (1) borrowing from or commingling investor funds; (2) acquiring any property with investor funds that does not belong to the limited partnership; or (3) mortgaging, conveying or encumbering partnership property that was not real property.

50.     As described in detail throughout the rest of this Complaint, the Defendants routinely violated these provisions when they misused, misappropriated, and commingled investor funds from the different projects. Instead of using investor funds as described in the use of proceeds documents, the Defendants frequently had investor funds flowing in a circular and roundabout manner among various accounts and entities, which allowed them to misuse and misappropriate investor funds.

51.     Stenger reviewed, was responsible for, and had authority over, the contents of the offering documents in Phases I-VI, including the limited partnership agreements and the use of proceeds documents. Moreover, Quiros reviewed the contents of the Phase I-VI offering documents, was familiar with them, and understood he had to abide by them. He also approved the use of proceeds document in Phases III-VI.

14

52.    Both Stenger and Quiros, as principals of the general partner for Biomedical Phase VII, reviewed and approved the contents of that project's offering documents, including the limited partnership agreement and the use of proceeds document.

53.    Interested investors made a $500,000 investment in a particular project, as well as paid an additional $50,000 administrative fee that Jay Peak and the other Defendants used for expenses associated with the investment, including fees to intermediaries. Each project had an escrow account at People's United Bank in Vermont (formerly known as the Chittenden Trust Company). Stenger was a signatory on all of the People's Bank accounts and routinely authorized the transfer of funds into and out of those accounts.

54.    The initial $500,000 investment normally was deposited into the People's Bank account for the specific project in which the investor was participating. Once the Immigration Service approved the investor's initial, or provisional, green card, Stenger typically had the $500,000 transferred to a Raymond James account that was set up in the name of the particular project through Raymond James' Coral Gables office.

55.    Stenger had no signatory or other authority over the Raymond James accounts. Rather, Quiros opened all of the Raymond James accounts, and had sole authority over them. The Raymond James broker listed on the accounts was Quiros' former son-in-law. Once the Raymond James accounts received transfers from the People's Bank accounts, it was solely Quiros who directed use of the funds.

56.    Quiros, Stenger, and other officers of Jay Peak and the Defendants oversaw and directed use of all investor funds and the development and construction of all projects. Investors played no role in the development, construction, or operation of the facilities.

## VI. THE DEFENDANTS FRAUDULENTLY USED INVESTOR FUNDS TO FINANCE QUIROS' PURCHASE OF JAY PEAK

15

57.     Jay Peak was originally owned by a Canadian firm, Mont Saint-Sauveur International, Inc. ("MSSI"), that oversaw the Phase I securities offering.  Stenger worked for MSSI at the time, and also oversaw the offering as the principal of Jay Peak Management, the general partner of Defendants Suites Phase I and Hotel Phase II.  Suites Phase I raised $17.5 million from 35 investors from December 2006 through May 2008.

58.     From January through June 2008, Quiros negotiated and finalized a stock transfer agreement between MSSI and Q Resorts in which MSSI agreed to transfer the real estate and other assets of Jay Peak to Q Resorts.  The agreement was signed on June 13, 2008, and the parties closed on the deal 10 days later, June 23, 2008, for a final price of $25.7 million.

59.     Jay Peak owned Suites Phase I.  During the time when Quiros and MSSI were negotiating the stock transfer agreement, Suites Phase I was raising funds from investors.  Approximately eight people invested in the Suites Phase I limited partnership between January and May 2008.

60.     Hotel Phase II began raising money in March 2008, and that limited partnership received $500,000 investments from 15 investors between March and June 2008 (a total of $7.5 million).  From July through September 2008, Hotel Phase II received $500,000 apiece from another 15 investors (a total of $7.5 million).

61.     In the five months before closing on the purchase of Jay Peak, Quiros was heavily involved in all aspects of the Jay Peak project, including understanding how the project raised money and managing the nascent Suites Phase I construction.  He knew Suites Phase I was raising money and investigated how that was being done before he bought Jay Peak.

62.     In preparation for the closing, Quiros asked MSSI representatives to open brokerage accounts at Raymond James with his former son-in-law in the names of the Suites

16

Phase I and Hotel Phase II limited partnerships. MSSI representatives agreed, and Stenger opened a Suites Phase I account at Raymond James on May 20, 2008. A month later, on June 20, 2008, he opened a Hotel Phase II account at Raymond James.

63.     Both the Suites Phase I and Hotel Phase II limited partnership agreements provided that the general partners could only put investor money in FDIC-insured bank accounts. As a brokerage firm, Raymond James was not a bank and not FDIC-insured. On May 12, 2008, eight days before he opened the Suites Phase I Raymond James account, Stenger signed an amendment on behalf of the general partner removing the requirement of an FDIC-insured bank account from the Suites Phase I limited partnership agreement. This cleared the way for the transfer of investor funds to Raymond James accounts. No such amendment was ever signed for the Hotel Phase II limited partnership agreement. Thus, Stenger's subsequent transfer of the $75 million raised from 150 Hotel Phase II investors in 2008, 2009, and 2010 from People's Bank to Raymond James and Quiros' control violated the Hotel Phase II limited partnership agreement.

64.     On June 16 and 17, 2008, in preparation for closing, MSSI transferred $11 million in Suites Phase I investor funds from People's Bank to Raymond James. Three days later, on June 20, MSSI transferred $7 million in Hotel Phase II investor funds from People's Bank to Raymond James. Stenger signed the wire transfer request for this $7 million. There was no money in either the Suites Phase I or Hotel Phase II Raymond James account before the three transfers described in this Paragraph.

65.     In conjunction with those transfers, MSSI representatives on June 18 wrote a letter to the Raymond James broker, with copies to Quiros and Stenger, among others, explaining that the funds in the MSSI Raymond James Suites Phase I account were investor funds. The letter further stated the investor money could only be used in the manner specified in the Suites

17

Phase I limited partnership agreement, and could not be used in any way to pay for Q Resorts'
purchase of Jay Peak.

66.     The letter went on to state that any money transferred to the Raymond James
Hotel Phase II account similarly consisted of investor funds, and that no one could use that
money to finance Q Resorts' purchase of Jay Peak.

67.     Despite the fact that MSSI clearly explained to Quiros and Stenger they could not
use investor money to purchase Jay Peak, Quiros – aided by transfers that Stenger made – did
exactly that.   Over the next two months Quiros, through Q Resorts, used $21.9 million of
investor funds – $12.4 million from Suites Phase I and $9.5 million from Hotel Phase II – to fund
the vast majority of his purchase of Jay Peak.

68.     Quiros began his fraudulent use of investor funds on June 17, the day before the
MSSI letter, when he opened two accounts at Raymond James under his name and control, one
each for Suites Phase I and Hotel Phase II.   On the day of closing, June 23, MSSI transferred the
$11 million in its Suites Phase I account at Raymond James to Quiros' new Suites Phase I
account.   The same day, MSSI transferred the $7 million in its Hotel Phase II account at
Raymond James to Quiros' new Hotel Phase II account.   MSSI closed the two Raymond James
accounts within days, leaving Quiros in total control of investor money.   Stenger, as the sole
principal of the Suites Phase I and Hotel Phase II general partners, knew he was supposed to
control investor funds.   Yet he willingly allowed Quiros to take control of the funds, abdicating
the responsibilities clearly laid out for him in the limited partnership agreements.

69.     Also on the day of closing, June 23, Quiros transferred $7.6 million of Suites
Phase I investor funds from his Suites Phase I Raymond James account and $6 million of Hotel
Phase II investor funds from his Hotel Phase II Raymond James account to another account

(previously empty) that he had just opened at Raymond James in the name of Q Resorts. He completed his first fraudulent transfer the same day when he wired $13.544 million from the Q Resorts account to the law firm representing MSSI as partial payment for the Jay Peak purchase.

70.   Over the next three months, Quiros made four additional payments totaling $5.5 million from the Q Resorts account to the same law firm as continued payment for the Jay Peak purchase. The specific payments were $1.5 million on July 1, 2008; $1 million on August 29, 2008; $500,000 on September 5, 2008; and $2.5 million on September 26, 2008.

71.   Quiros made three additional transfers from the Q Resorts account totaling $2.9 million – $2 million on June 25, 2008; $628,684 on June 26, 2008; and $263,000 on September 3, 2008 – all to the law firm that had represented Q Resorts in the purchase.

72.   Quiros and Q Resorts made all of these payments improperly using investor funds. For example, to fund the $2 million June 25 payment to Q Resorts' law firm, Quiros transferred $2 million derived from Suites Phase I investor funds from his Suites Phase I Raymond James account to the Q Resorts account, then immediately wired that $2 million to the Q Resorts law firm. The next day he arranged the transfer of just under $300,000 each from the Suites Phase I and Hotel Phase II Raymond James accounts in his name to the Q Resorts account, which he used to send $628,684 to the law firm.

73.   Stenger facilitated many of these payments by transferring additional money to the Raymond James accounts. For example, on July 1, 2008, Stenger authorized the transfer of $1 million of Suites Phase I investor funds from a Suites Phase I account at People's Bank to the Q Resorts account at Raymond James. The same day he authorized the transfer of $600,000 in Hotel Phase II investor funds from the Hotel Phase II account at People's Bank to the Q Resorts account. Quiros turned right around and wired $1.5 million of that money to the law firm

19

representing MSSI. Subsequent transactions followed a similar pattern – Stenger transferring Suites Phase I or Hotel Phase II money from People's Bank either to Quiros' Suites Phase I and Hotel Phase II accounts or the Q Resorts account at Raymond James, and Quiros using that money to pay either the Q Resorts or MSSI law firm. In addition, to facilitate some of these payments, Quiros transferred Phase I and II investor funds between the Suites Phase I and Hotel Phase II accounts at Raymond James.

74.     The limited partnership agreements and the use of proceeds documents for Phases I and II, all provided to investors before they invested, prohibited this use of investor funds. As noted in Paragraph 47, in Suites Phase I, the document entitled "Source and Use of Investor Funds" showed the use of the investors' $17.5 million specifically for $10.4 million for construction, $1.6 million for operating systems and equipment, $800,000 for utilities and common areas, $1.8 million to Jay Peak for purchase of the land, approximately $600,000 to Jay Peak if there were cost overruns, about $400,000 for working capital, and $1.9 million to Jay Peak for developer fees. There was nothing in the use of proceeds document allowing Quiros or Suites Phase I to use $12.4 million of Phase I investor money to purchase Jay Peak. At the time of the transfers of the $12.4 million, Jay Peak had barely begun construction and had not paid for the project property. Therefore, it was only entitled to take about $60,000 of the $17.5 million of investor money in developer, contingent, and land fees. Even at the conclusion of Suites Phase I construction, years later, at most Jay Peak was only entitled to take $4.3 million of investor money broken down this way: $1.8 million after the land sale was completed, 15% in construction costs as construction was completed up to $1.9 million as a maximum, and $600,000 in contingency fees if there were cost overruns. This is far short of the $12.4 million of investor money Quiros improperly used on the Jay Peak purchase.

20

75.     Likewise, the Hotel Phase II use of proceeds document given to investors, entitled Estimated and Projected Cost of Development, showed a detailed breakdown of how Jay Peak would spend the $75 million it raised from investors.   This included $37 million for hotel construction, $23 million for the other parts of Phase II, and additional money for utilities, land, cost overruns, and construction supervision fees.   There was nothing in this document that allowed Quiros or Hotel Phase II to use $9.5 million of Phase II investor funds to buy Jay Peak in 2008 – particularly because at the time of the transfers, construction on Hotel Phase II had not started and the land sale had not occurred.   Therefore, Jay Peak was not entitled to take any investor money as fees for itself at that time.

76.     In addition, after misusing Hotel Phase II investor funds, the relevant Defendants – Stenger, Quiros, Jay Peak, Hotel Phase II, and Jay Peak Management – did not change the use of proceeds document they gave to future investors to show they had used $9.5 million of investor funds to purchase Jay Peak.

77.     The use of investor funds to purchase Jay Peak also contravened prohibitions in the Phase I and II limited partnership agreements.   Each agreement contained a Section 5.02, entitled "Limitations on the Authority of the General Partner."   That section in each agreement prevented the general partner from borrowing or commingling investor funds and from making the type of purchase Quiros and Q Resorts made of Jay Peak without investor consent.

## VII.  IMPROPER USE OF INVESTOR FUNDS FOR MARGIN LOANS

78.     Quiros, through Q Resorts, JCM, Jay Peak and the limited partnerships, also misused investor funds from all seven limited partnership offerings by pledging them as collateral for margin loans in his Raymond James accounts, and eventually using funds from the limited partnerships to pay down and pay off the margin loans.

21

79.    Quiros' use of margin loans began in June 2008.  When he opened his Raymond James Suites Phase I and Hotel Phase II accounts, Quiros signed a credit agreement with Raymond James to allow both accounts to hold margin balances – meaning the accounts could borrow money (which would have to be paid back with interest) and hold negative cash balances. Put another way, the accounts went into debt to Raymond James when they incurred margin balances.

80.    The credit agreement Quiros signed pledged amounts in both Suites Phase I and Hotel Phase II accounts, as well as all of the assets of the Suites Phase I limited partnership, as collateral for any margin loans the accounts incurred.  As Jay Peak began new offerings, Quiros opened new accounts at Raymond James in the name of each new limited partnership, to which Stenger transferred investor funds from the corresponding account at People's Bank where investors deposited their money.

81.    So, for example, investors in Penthouse Phase III sent their investments to an escrow account at People's Bank in the name of Penthouse Phase III.  Stenger had signatory authority and control over that account.  When the offering began, Quiros opened an account at Raymond James in the name of Penthouse Phase III, over which only he had signatory authority and control.  Once Penthouse Phase III investors had their conditional green cards approved, Stenger approved the transfer of those investors' $500,000 deposits to the Penthouse Phase III Raymond James account, thereby giving up control over that money to Quiros.  Each time this happened, Stenger violated terms of the limited partnership agreements.  Stenger, as the principal of the general partner in Phases I-VI, always had ultimate responsibility for the overall management and control of the business assets and the affairs of the six limited partnerships, and the obligation to place partnership funds in accounts in the names of the partnerships.  Stenger

abdicated these responsibilities by giving Quiros complete control of the partnerships' funds and by placing investor funds in accounts to which he did not have access.

82.     The process in Phases II and IV-VII worked the same way.  Furthermore, each time he opened a new Raymond James account, Quiros signed a new credit agreement pledging the assets of that account – in each case comprised of or derived from investor funds – as collateral for the margin loans he continued to hold at Raymond James.  Quiros signed a credit agreement on February 6, 2009, pledging investor funds in the Suites Phase I and Hotel Phase II Raymond James accounts as collateral for the margin loans.  He signed one on October 1, 2010, expanding the list of accounts to Penthouse Phase III and Q Resorts.  Quiros signed a credit agreement on February 10, 2011, adding the account for Golf and Mountain Phase IV.  He signed the next one on August 25, 2011, adding the account for Lodge and Townhouses Phase V.  On February 28, 2012, he signed a credit agreement adding the account for Stateside Phase VI as collateral for the margin loans.  And on August 5, 2013, Quiros signed a credit agreement adding the accounts for Biomedical Phase VII and JCM (which as described above and below held investor funds).

83.     Thus, in every offering, Quiros put investor funds at risk by pledging them as collateral for the margin loans.  Raymond James could have insisted on payment of the margin loans, and Quiros would have had no choice but to pay them off with investor funds slated for use to construct the various projects unless he could come up with a replacement source of funding.  And, as described below in Paragraphs 92-95, Quiros eventually paid off the margin loans using investor funds.

84.     Quiros' establishment of the margin loans violated the terms of each of the limited partnership agreements (which the Defendants provided to all investors).  Those

23

agreements specifically prohibited the projects' general partners from encumbering or pledging investor funds as collateral without the express approval of the investors. Furthermore, none of the offering documents the Defendants provided to investors said that any of the limited partnerships, general partners, Quiros, Stenger, Q Resorts, or Jay Peak could pledge investor funds as collateral for loans. In fact, the use of proceeds document in every offering, which set forth exactly how the Defendants would spend investors' money, did not provide for use of investor funds as collateral for or to pay off margin loans. Neither Stenger nor Quiros ever told any investors the companies in which they were investing could use or were using their money in this fashion.

85.    Quiros began incurring margin loan debt in the Suites Phase I and Hotel Phase II accounts almost immediately after closing on the purchase of Jay Peak. On June 25, 2008, in an apparent attempt to give the appearance that investor funds remained in the Suites Phase I account at Raymond James, Quiros directed the purchase of $11 million in Treasury Bills. That $11 million purchase matched the $11 million of Suites Phase I investor funds MSSI had transferred to Quiros' Suites Phase I account. But, as described in Paragraph 69, by this time Quiros had transferred $7.6 million of the $11 million out of the account to pay for the purchase of Jay Peak. There was only $3.4 million in investor funds left in the Suites Phase I account. Therefore, Quiros' Suites Phase I account had to incur a margin loan balance of $7.6 million to buy Treasury Bills (the difference between the $3.4 million in the account and the full $11 million purchase). Under terms of the credit agreement Quiros had signed, that $7.6 million was actually a debt to Raymond James. Thus, Suites Phase I investors did not have a claim to the $11 million in Treasury Bills, and the $3.4 million in investor funds still in the Suites Phase I account was at risk of being forfeited to Raymond James if there was a margin call.

24

86.    Quiros undertook the same acts in the Hotel Phase II account at Raymond James on the same day.  On June 25, he ordered the purchase of $7 million in Treasury Bills in that account.  Again, this amount matched the $7 million of Hotel Phase II investor funds MSSI had transferred to Quiros' Hotel Phase II account.  But again, Quiros had already transferred $6 million of that amount out of the account to pay for Q Resorts' purchase of Jay Peak.  *See* Paragraph 69.  There was only $1 million in investor funds left in the Hotel Phase II account. Therefore, Quiros' Hotel Phase II account had to incur a margin loan balance of $6 million to buy Treasury Bills (the difference between the $1 million in the account and the $7 million purchase).  Under terms of the credit agreement Quiros had signed, that $6 million was actually a debt to Raymond James.  Hotel Phase II investors did not have a claim to the full $7 million in Treasury Bills, and the $1 million in investor funds still in the Hotel Phase II account was at risk of being forfeited to Raymond James if there was a margin call.

87.    Quiros continued to make use of the margin loans in the Suites Phase I and Hotel Phase II accounts at Raymond James to pay the remainder of the purchase price for Jay Peak between June and September 2008.  When he transferred funds out of the accounts to pay either Q Resorts' or MSSI's law firm as described in Paragraphs 69-71, that often increased the margin loan balance in the accounts, putting investor funds further at risk.

88.    Furthermore, on at least one other occasion during that time period, Quiros directed the purchase of an additional $1.5 million in Treasury Bills in the Suites Phase I account at Raymond James to match an amount of Suites Phase I investor funds the account had received from People's Bank.  Stenger had authorized transfer of the funds from People's Bank.  Again, the purchase was a ruse, as Quiros had already transferred $1 million of the $1.5 million out of the account to pay for the purchase of Jay Peak, leaving the Treasury Bills not as belonging to

25

investors, but as collateral for the margin loan balance to Raymond James.

89.     From October 2008 until February 2009, Quiros continued to maintain the margin loan balances in his Suites Phase I and Hotel Phase II accounts at Raymond James, with investor funds pledged as collateral in violation of the Phase I and II use of proceeds documents and the limited partnership agreements (*see* Paragraphs 74-75 and 84). By February 2009, the combined margin loan balances of the two accounts had reached $23.8 million. Stenger had continued to authorize transfers of investor funds from the People's Bank Phase I and II accounts to the Raymond James accounts, which then became collateral for the margin loans.

90.     That month, Quiros consolidated the two margin loans into one (Margin Loan III), and signed a new credit agreement that continued to pledge Phase I and II investor funds to back the margin loan balance. Over the next three years, Quiros signed the aforementioned credit agreements pledging investor funds from Phases III-VI as collateral. He also used more than $105 million of investor funds from Phases I-V towards paying down Margin Loan III, breaking down as follows: approximately $2.2 million from Suites Phase I, approximately $51.6 million from Hotel Phase II, approximately $32.5 million from Penthouse Phase III, approximately a net amount of $15.8 million from Golf and Mountain Phase IV; and approximately $5.6 million from Lodge and Townhouses Phase V.

91.     Margin Loan III continued to be backed by Suites Phase I and Hotel Phase II investor funds, putting them at risk, until February 2012. In addition, during this same time, the Defendants commingled Suites Phase I investor funds with other projects. For example, on October 3, 2011, Stenger authorized a transfer of $49,000 from the Penthouse Phase III account at People's Bank to the People's Bank Suites Phase I account. And on February 23, 2012, Stenger authorized a transfer of almost $62,000 from the Suites Phase I account to the Hotel

Phase II account, both at People's Bank.

92.     Because Quiros continued spending money from the margin loan account at Raymond James, the Margin Loan III balance remained at approximately $23 million in February 2012.  On February 24, 2012, Quiros transferred approximately $22.4 million of investor funds from the Q Resorts account at Raymond James to pay off the $23.4 million balance.  The $22.4 million of investor funds breaks down as follows: approximately $5.8 million of this amount came from Stateside Phase VI, and approximately $16.6 million of this amount came from Lodge and Townhouses Phase V.

93.     However, just four days after paying off Margin Loan III, on February 28, 2012, Quiros opened yet another margin loan account in the name of Jay Peak at Raymond James (Margin Loan IV).  This time he signed a credit agreement pledging investor funds in accounts from Lodge and Townhouses Phase V and Stateside Phase VI as collateral for the margin loan balances.  In August 2013, he added the accounts of JCM and Biomedical Phase VII, and reconfirmed the account of Q Resorts, to a new credit agreement.

94.     From February 2012 through March 2014, Quiros used more than $6.5 million of investor funds from Phases V-VI towards paying down Margin Loan IV.  However, because Quiros spent approximately $25.5 million on the new margin loan account on various project-related and non-project expenses, the Margin Loan IV balance was approximately $19.4 million in February 2014.

95.     Raymond James then demanded that Quiros pay off Margin Loan IV.  In response, on March 5, 2014, Quiros transferred approximately $18.2 million of investor funds derived from a Biomedical Phase VII account at People's Bank, which he used as part of a $19 million pay off of this margin loan.  The pay down and pay off of this margin loan was a major

27

contributor to Biomedical Phase VII project shortfalls.

## VIII. MISREPRESENTATIONS AND OMISSIONS IN PHASES II-VI

### A. Hotel Phase II

96.     Hotel Phase II, Jay Peak Management, Jay Peak, and Stenger (and Quiros and Q Resorts as the owners of Jay Peak) misrepresented in the Hotel Phase II use of proceeds document how they would spend investor money.  As discussed in Paragraph 75, the Hotel Phase II use of proceeds document set forth how these Defendants would spend investors' money, down to the dollar.  The Defendants used Hotel Phase II investor funds in four ways that were different than specifically set forth in the use of proceeds document:

- *First*, as discussed in Paragraphs 68 to 73, they used $9.5 million of Hotel Phase II investor money between June and September 2008 to help finance Quiros' and Q Resorts' purchase of Jay Peak.

- *Second*, as discussed in Paragraphs 79 to 92, Quiros and Q Resorts used Hotel Phase II investor funds as collateral for Margin Loan III until February 2012, and used more than $50 million of investor funds to pay down this margin loan at Raymond James between February 2009 and January 2011.

- *Third*, Quiros and Q Resort used a net amount of $4.7 million of Hotel Phase II investor funds for Suites Phase I project costs.

- *Fourth*, Quiros and Q Resorts used a net amount of $3 million of Hotel Phase II investor funds on Penthouse Phase III project costs.

97.     The same Defendants listed in Paragraph 96 also misrepresented in the Hotel Phase II limited partnership agreement certain restrictions on the general partner's use of investor funds.  As set forth in Paragraph 77, the limited partnership agreement prohibited the Hotel Phase II general partner – Jay Peak Management and Stenger – from commingling investor

28

funds, borrowing them, using them as collateral, or using them to buy property not part of the limited partnership, without the consent of the investors. Hotel Phase II, Jay Peak Management, Jay Peak, and Stenger (and Quiros and Q Resorts as the owners of Jay Peak) violated those provisions in these ways:

- *First*, as discussed in Paragraphs 79 to 92, Quiros and Q Resorts used Hotel Phase II investor funds as collateral for Margin Loan III until February 2012, and used more than $50 million of investor funds to pay down this margin loan at Raymond James between February 2009 and January 2011.

- *Second*, between October 2010 and January 2011, Quiros and Q Resorts transferred a net amount of $4.7 million of Hotel Phase II investor funds from the Phase II account at Raymond James to the Suites Phase I account at Raymond James for Phase I project costs.

- *Third*, Quiros and Q Resorts used a net amount of $3 million of Hotel Phase II investor funds on Penthouse Phase III project costs.

- *Fourth*, these Defendants violated the commingling provision of the limited partnership agreement by putting a net amount of $11.2 million of Phase II investor funds into Q Resorts' Raymond James account between June 2008 and April 28, 2011, where they were mixed with funds from Penthouse Phase III. This included an April 28, 2011 $500,000 transfer from a Phase II account into Q Resorts' Raymond James account.

98.   Stenger was on notice as early as 2010 that Quiros was improperly using investor funds. The former CFO of Jay Peak voiced concerns to Stenger on several occasions that year that he could not get statements from the Raymond James accounts from Quiros to determine how he was using investor funds. The CFO also told Stenger in conversations and in writing that

his analysis of Suites Phase I and Hotel Phase II records showed Jay Peak had already used a minimum of $8.4 million of Hotel Phase II money to pay Suites Phase I construction costs. Stenger falsely told the CFO there were sufficient funds either from Hotel Phase II investor money or future project management fees to cover Hotel Phase II construction costs.

## B. Penthouse Phase III

99.    Penthouse Phase III, Jay Peak GP Services, Jay Peak, and Stenger (and Quiros and Q Resorts as the owners of Jay Peak) misrepresented in the Penthouse Phase III use of proceeds document how they would spend investor money.

100.    Penthouse Phase III raised $32.5 million from 65 investors.  The Penthouse Phase III use of proceeds document, found under the term "Investor Funds Source and Application" in the business plan given to investors, stated Jay Peak would spend almost $28.1 million of that $32.5 million on construction of the Penthouse Suites hotel (included in this amount was approximately $900,000 for cost overruns and approximately $2.8 million for construction supervision fees, and the remaining $4.4 million on the accompanying recreation and learning centers and a café and bar (Jay Peak was to contribute another $5 million).  At most Jay Peak and the other Defendants could receive approximately $3.7 million of that $32.5 million for their own use, which is broken down as follows: (a) as construction costs were paid, the project developer could add 15 percent to construction-related costs as developer fee up to a maximum of $2.8 million; and (b) if there were cost overruns, the developer could take up to $900,000 in investor funds.

101.    Yet the Defendants violated the use of proceeds document when Quiros and Q Resorts misused almost all of the $32.5 million raised from Penthouse Phase III investors to pay down Margin Loan III at Raymond James.  There was nothing in the use of proceeds document

indicating the Defendants could spend investor funds on paying down a margin loan.

102.    The same Defendants listed in Paragraph 99 also misrepresented in the Penthouse Phase III limited partnership agreement certain restrictions on the general partner's use of investor funds.  The limited partnership agreement prohibited the Penthouse Phase III general partner – Jay Peak GP Services and Stenger – from commingling investor funds, borrowing or pledging them, or using them as collateral, without the consent of the investors.  The Defendants violated those provisions in two ways:

- ■ *First*, as discussed above, Quiros and Q Resorts used Penthouse Phase III investor funds as collateral for Margin Loan III and used almost all of the $32.5 million of investor funds on paying down that margin loan between December 2010 and August 2011.

- ■ *Second,* Quiros and Q Resorts violated the commingling provision of the limited partnership agreement by putting a net amount of $4.5 million of Penthouse Phase III investor funds into Q Resorts' Raymond James account, where they were mixed with funds from Hotel Phase II.

### C.  Golf And Mountain Phase IV

103.    Golf and Mountain Phase IV, Jay Peak GP Services Golf, Jay Peak, and Stenger (and Quiros and Q Resorts as the owners of Jay Peak) misrepresented in the Golf and Mountain Phase IV use of proceeds document how they would spend investor money.

104.    Golf and Mountain Phase IV raised $45 million from 90 investors.  The Golf and Mountain Phase IV use of proceeds document in the business plan given to investors stated Jay Peak would spend the $45 million raised from investors this way: $22.8 million on the honeymoon cottages, $5.4 million on a retail center, almost $2.7 million on a wedding chapel, $4 million on a café, $3.8 million on parking, $1.8 million for land, approximately $3.4 million for

supervision fees, and approximately $1.1 million for supervision expenses. Therefore, at most Jay Peak and the other Defendants could receive approximately $6.3 million of the $45 million, which is broken down as follows: (a) after the land sale was completed, Jay Peak (as the project developer) could charge $1.8 million; (b) as construction costs were paid, the project developer could add 15 percent to construction-related costs as supervision fees up to a maximum of $3.4 million; and (c) if the project developer incurred construction expenses, it could take a maximum of $1.1 million in supervision expenses.

105.    The Defendants in Paragraph 103 violated the use of proceeds document when Quiros and Q Resorts used a net amount of $15.8 million of investor money to pay down Margin Loan III at Raymond James between May and November 2011. There was nothing in the use of proceeds document stating the Defendants could use investor funds to pay down a margin loan.

106.    These same Defendants also misrepresented in the Golf and Mountain Phase IV limited partnership agreement the restrictions on the general partner's use of investor funds. The limited partnership agreement prohibited the Golf and Mountain Phase IV general partner – Jay Peak JP Services Golf and Stenger – from commingling investor funds, borrowing or pledging them, or using them as collateral, without the consent of the investors. Yet the Defendants violated these provisions by Quiros and Q Resorts using the funds as collateral for, and to pay down, Margin Loan III. They also commingled $34.3 million of Golf and Mountain Phase IV funds by putting them into a JCM account at Raymond James where investor funds from Phases IV through VII were deposited.


### D.  Lodge and Townhouses Phase V

107.    Lodge and Townhouses Phase V, Jay Peak GP Services Lodge, Jay Peak, and

32

Stenger (and Quiros and Q Resorts as the owners of Jay Peak) misrepresented in the Lodge and Townhouses Phase V use of proceeds document how they would spend investor money.

108.   Lodge and Townhouses Phase V raised $45 million from 90 investors. The Lodge and Townhouses Phase V use of proceeds document in the business plan given to investors stated Jay Peak would spend the $45 million raised from investors this way: $10.8 million on the vacation rental townhouses; $18.6 million on vacation rental cottages, $7.2 million on ancillary facilities (a café, parking garage, tennis courts, and an auditorium), about $1 million on parking, pathways, and working capital, $2.4 million for the land sale, $3.5 million of management and supervision fees, and $1.5 million for supervision expenses. At most, Jay Peak and the other Defendants as the project developer could take approximately $7.4 million of the $45 million, which is broken down as follows: (a) after the land sale was completed, the project developer could charge approximately $2.4 million; (b) as construction costs were paid, the project developer could add from 10 to 15 percent to construction-related costs as management and supervision fees up to a maximum of $3.5 million; and (c) if the project developer incurred expenses, it could charge investors up to approximately $1.5 million for miscellaneous expenses.

109.   The Defendants in Paragraph 107 violated the use of proceeds document when Quiros and Q Resorts used at least $25.2 million of investor money to pay down Margin Loans III and IV at Raymond James and to pay off Margin Loan III. There was nothing in the use of proceeds document stating the Defendants could use investor money to pay down and pay off margin loans.

110.   These same Defendants also misrepresented in the Lodge and Townhouses Phase V limited partnership agreement the restrictions on the general partner's use of investor funds. The limited partnership agreement prohibited the Lodge and Townhouses Phase V general

partner – Jay Peak JP Services Lodge and Stenger – from commingling investor funds, borrowing or pledging them, or using them as collateral, without the consent of the investors. Yet these Defendants violated these provisions by Quiros and Q Resorts pledging partnership assets as collateral and by paying down the two margin loans at Raymond James and paying off Margin Loan III. They also commingled $36 million of Phase V funds by putting them into a JCM account at Raymond James where investor funds from Phases IV through VII were deposited.

### E. Stateside Phase VI

111.    Stateside Phase VI, Jay Peak GP Services Stateside, Jay Peak, and Stenger (and Quiros and Q Resorts as the owners of Jay Peak) misrepresented in the Stateside Phase VI use of proceeds document how they would spend investor money.

112.    Stateside Phase VI raised $67 million from 134 investors. The Stateside Phase VI use of proceeds document in the business plan given to investors stated Jay Peak would spend the $67 million raised from investors this way: approximately $22.5 million on the vacation rental cottages; about $20.8 million on the Stateside hotel suites; $2.3 million on the medical center; $7.3 million on the recreation center; about $4.2 million on miscellaneous other expenses, $2.5 million for land, approximately $5.4 million in supervision fees, and $2.2 million in supervision expenses. In addition, the project sponsor had to contribute $20 million to the project. Upon completing construction, at most Jay Peak and the other Defendants as the project developer could take $10.1 million of the $67 million, broken down as follows: (a) after the land sale was completed, the project developer could charge approximately $2.5 million; (b) as construction costs were paid, the project developer could add 10 to 15 percent to construction-related costs as supervision fees up to a maximum of $5.4 million; and (c) if the project

developer incurred expenses, it could take $2.2 million in investor funds as supervision expenses.

113.   The Defendants in Paragraph 111 violated the use of proceeds document when Quiros and Q Resorts used $5.8 million of investor money to pay off Margin Loan III, and up to $2.5 million to pay down Margin Loan IV.  There was nothing in the use of proceeds document indicating the Defendants could spend investor money on paying down or paying off margin loans.

114.   These same Defendants also misrepresented in the Stateside Phase VI limited partnership agreement the restrictions on the general partner's use of investor funds.  The limited partnership agreement prohibited the Stateside Phase VI general partner – Jay Peak JP Services Stateside and Stenger – from commingling investor funds, borrowing or pledging them, or using them as collateral, without the consent of the investors.  Yet these Defendants violated these provisions by Quiros and Q Resorts pledging partnership assets as collateral and by investor funds to pay down and pay off margin loans.  They also commingled $63 million of Phase VI funds – almost all of the money raised from investors for this project – by putting them into a JCM account at Raymond James where investor funds from Phases IV through VII were deposited.

115.   Quiros' and the other Defendants' misuse and looting of investor funds have finally caught up with them.  The Defendants have run out of investor money to complete the Stateside project due to their misappropriation and misuse of that money.  The Defendants built the Stateside hotel in 2013, but are not anywhere close to completing the remainder of the project – the vacation cottages, the medical center, and the recreation center.  Based on the amount the Defendants have already spent on building the vacation cottages, the medical center, and the recreation center and the Defendants' own future cost estimates, they need at least another $26

million to finish Stateside. With all the commingling of funds and use of money for improper purposes, including paying off the margin loan, as of September 30, 2015, the Stateside accounts had only approximately $58,000 left in them. If the project is not completed, investors cannot realize their promised return, and likely will lose a portion of their principal and their opportunity to obtain permanent green cards.

## IX. MISREPRESENTATIONS AND OMISSIONS IN BIOMEDICAL PHASE VII

### A. Misrepresentations And Omissions About The FDA Approval Process

116. Quiros, Stenger, Jay Peak, Biomedical Phase VII, and AnC Bio Vermont GP Services began offering the Biomedical Phase VII investment in November 2012. It purportedly involves the construction of the biomedical research facility the Defendants will use for several purposes. These include operating and leasing "clean rooms" – facilities in pristine condition for medical research – conducting stem cell research, and developing, manufacturing, and distributing certain artificial organs. Among the artificial organs are a heart-lung machine called T-PLS, an artificial kidney called C-PAK, and a liver replacement device called E-LIVER.

117. From the start, the Biomedical Phase VII offering has been rampant with fraud. The original offering materials projected the facility would be complete and operating in 2014. They forecasted the project would create 3,000 jobs and achieve more than $306 million in annual revenue by 2018. However, the revenue projections were baseless as discussed below, and the Biomedical Phase VII offering documents made significant misrepresentations and material omissions regarding FDA approval of the products the facility was to develop and manufacture. Moreover, practically from the beginning, Quiros started siphoning tens of millions of dollars from this project.

118. The success of the biomedical research facility was highly dependent on FDA

36

approval of the products, as the products requiring FDA approval accounted for 67% to 100% of the facility's projected annual revenue from 2014 through 2018. Without FDA approval, Biomedical Phase VII could not market and sell the vast majority of the products it proposed to develop and manufacture in the United States. Thus, any delay or failure to obtain FDA approval would dramatically reduce the scope of the research center and the projected revenues.

119. The Defendants listed in Paragraph 116 knew their products required FDA approval. The offering materials indicated the project "plans on developing, producing, and marketing the products . . . once FDA approval is obtained." The FDA review and approval process depends on the type of medical device, but generally the process can take years between pre-submission steps such as development of the product, clinical studies and testing, and discussions with the FDA. The Defendants were aware of this fact also. For example, the business plan in the Biomedical Phase VII offering materials indicated its development, testing, and other pre-submission steps for the stem cell products alone would take 3½ years.

120. Despite the Defendants' knowledge of the lengthy FDA process, the Biomedical Phase VII offering documents misrepresented the status of the process. In an information sheet attached to the PPM, the Defendants stated that the T-PLS device was "currently under process of US FDA approval." In the same document, the offering materials indicated the C-PAK system was "currently under progress of US FDA approval (2013)."

121. These statements were patently false, as when the Defendants made them, they had not submitted the T-PLS device, the C-PAK system, or *any* Biomedical Phase VII product to the FDA for approval. Stenger and Quiros were fully aware of this fact. At the time the Defendants distributed the Biomedical Phase VII offering materials in 2012 and 2013, Stenger was heading up the company's FDA approval efforts. Stenger knew full well that the *only*

contact he had had with the FDA prior to 2012 consisted of two isolated email exchanges in June 2010 and February 2011, and a telephone call in 2010. All of these exchanges were about Biomedical Phase VII first contacting the FDA, not to submit any products for review, but only to get more information on and discuss the review and approval process.

122.    Thus, there was no truth to the statements that the Biomedical Phase VII products had been submitted to the FDA. In fact, to date, more than three years after that misrepresentation, the company has *still* not submitted any products to the FDA for its review and approval. Even Stenger has acknowledged the statements in the offering materials were misleading.

123.    In addition to overseeing Biomedical Phase VII's FDA efforts, Stenger, in his role as principal of the Biomedical Phase VII general partner, had ultimate authority over the contents of the Phase VII offering materials, and reviewed and approved them. Quiros, as the other principal of Biomedical Phase VII's general partner, also reviewed and approved the Phase VII offering materials, and had ultimate authority over them.

**B.  Baseless Revenue Projections**

124.    The Biomedical Phase VII offering materials also contained revenue projections that were baseless because, among other things, they contemplated the company realizing revenue from its products before its facilities were operational and before the company received FDA approval.

125.    The offering documents, dated November 2012, included a business plan that stated operations at the Vermont facilities – where the company said all its research and product development would take place – would begin by April 15, 2014. In other words, that was the date by which Biomedical would *begin* developing and testing its products. Despite that,

Biomedical Phase VII's offering materials stated the company would begin realizing product revenue the very same year, and almost $660 million in revenue from 2015-2018.

126. However, a separate schedule contained in the business plan shows those projections to be without any basis. The September 2011 schedule, which not all investors received, showed a much longer timetable for revenue realization. Taking into account that Biomedical Phase VII could not start developing and testing its products until April 2014 when its facilities would be operational, and the years needed to get FDA approval, the September 2011 schedule showed Phase VII could only realistically realize 20 to 33 percent of the revenue the Defendants projected to investors in the offering materials. The schedule also showed Biomedical Phase VII could not begin realizing revenues on its products until much later than its offering documents showed – in some cases as late as 2018 instead of 2014 or 2015. Thus, Biomedical Phase VII's own documents show its revenue projections were wildly overstated.

## C. Further Misrepresentations And Misappropriation Of Phase VII Investor Money

127. The Biomedical Phase VII use of proceeds document given to investors also misrepresented how Jay Peak, the general partner of Phase VII (AnC Bio Vermont GP Services), Stenger, Quiros, and Q Resorts would spend investor money. Furthermore, as with the previous Phases, the Phase VII limited partnership agreement misrepresented the restrictions on how the same Defendants could use investor money.

128. The use of proceeds document, contained in the Biomedical Phase VII business plan, spelled out how the Defendants would use Phase VII investor funds: $63.2 million on construction of the clean rooms, $10 million on distribution and marketing rights for the medical devices, $15.6 million on working capital, $400,000 on parking and access roads, $2.1 million on design, architecture, and engineering, $6 million for land, approximately $9.5 million in

39

supervision fees, and approximately $3.2 million in supervision expenses. In addition, the project sponsor must contribute $8 million to the project. Upon the project being fully funded and completed, at most Jay Peak and the other Defendants as project developer could take approximately $18.7 million of the $110 million, broken down as follows: (a) after the land sale was completed, the project developer could charge $6 million; (b) as construction costs were paid, the project developer could add 15 percent to construction-related costs as supervision fees up to a maximum of $9.5 million; and (c) if the project developer incurred expenses, it could take up to approximately $3.2 million for supervision expenses. The Defendants cannot charge construction supervision fees on any other category of costs besides construction of the clean rooms. As of September 30, 2015, at best only approximately $2 million of these construction supervision fees had been earned.

129.    The Phase VII limited partnership agreement contained nearly identical restrictions on the general partner's use of funds as the limited partnership agreements in earlier phases. Quiros and Stenger, and principals of AnC Bio Vermont GP Services, could not commingle investor funds, and could not borrow, collateralize, or pledge investor funds to non-approved uses without the consent of the investors.

130.    Biomedical Phase VII, Jay Peak, Stenger, Quiros, Q Resorts, and AnC Bio Vermont GP Services regularly violated the use of proceeds document and limited partnership agreements when they pilfered tens of millions of dollars of investor funds for a variety of improper expenses:

- $18.2 million towards paying off Margin Loan IV at Raymond James, which the brokerage firm had called due;

- $4.2 million for corporate taxes to the IRS and State of Vermont;

■ $10.7 million to back Quiros' personal line of credit, out of which he used $6 million
more for personal income taxes, $1.4 million to pay purported returns to investors in
earlier projects, and $3.5 million to pay Stateside construction vendors;

■ $2.2 million to purchase a Trump Place condominium for Quiros in New York;

■ $7 million to purchase Q Burke resort;

■ $7.9 million to Northeast for purported construction supervision fees when little
construction has taken place; and

■ $6 million for the sale of seven acres of land for the research facility from GSI to
Biomedical Phase VII in December 2012.  This $6 million price represents a huge
markup on the land from the price at which Quiros (through GSI) purchased it just 18
months earlier; in fact Quiros bought a 25-acre tract (of which the seven acres were a
part) for $3.15 million in July 2011.  The seven-acre parcel Quiros sold (through) GSI to
Biomedical Phase VII for $6 million was appraised as of December 2012 at only
$620,000.  Furthermore, the property deed showing transfer of ownership to Biomedical
Phase VII has not been recorded.

### *1. Paying Off Margin Loan IV*

131.    As discussed above in Paragraph 95, Raymond James insisted that Quiros pay off
the $19 million balance of Margin Loan IV.  In response, in March 2014, Quiros paid off Margin
Loan IV using more than $18 million of Biomedical Phase VII funds.  At that time, Biomedical
Phase VII had an agreement with an affiliated Korean firm, AnC BioPharm, to provide
equipment and engineering services as part of $63.2 million category of costs called Biomedical
Research Clean Rooms.  As the Clean Rooms were paid for and constructed, the Phase VII
project manager (Northeast) could charge a fee of 15 percent of the "construction supervision

costs" plus five percent for "supervision expenses."

132. Accordingly, from approximately February 2013 through approximately October 2014, JCM submitted a series of false invoices for Clean Room and other costs. JCM received $47 million of Biomedical Phase VII investor funds in return. Quiros did not use a vast majority of the investor funds JCM received for their intended purpose (construction costs). Instead, he used the money to pay $4.2 million in JCM taxes and another $10.7 million as part of the collateral for a personal line of credit at Citibank. Out of this line of credit, Quiros paid approximately $6 million of his personal taxes (this payment went through GSI), approximately $3.5 million for Stateside Phase VI construction vendors, and approximately $1.4 million of alleged returns to investors in Phases III-VI.

133. To mask this misuse of investor funds as well as his use of $7 million from Margin Loan IV to purchase Q Burke, Quiros had JCM pay off the margin loan in March 2014 using $18.2 million of the Biomedical Phase VII investor funds JCM had received through the fraudulent invoices.

### 2. Taxes To The IRS And The State Of Vermont

134. Quiros used $4.2 million in Biomedical Phase VII investor funds to pay a portion of JCM's income taxes to the IRS and the State of Vermont in 2013.

### 3. The Citibank Line Of Credit

135. In 2015, Quiros secured a more than $15 million personal line of credit with Citibank, which he then backed with more than $10.7 million of Biomedical Phase VII investor funds he had sent from Phase VII to JCM. For each dollar of the line of credit Quiros used, Citibank held a corresponding amount of the investor funds. Therefore the investor funds were not available to JCM or any entity to use on Biomedical Phase VII construction costs until

Quiros paid down the loan. Quiros had falsely claimed to Citibank that none of the funds backing the account belonged to JCM's customers, such as Biomedical Phase VII.

136. Around April 2015, Quiros transferred approximately $10.7 million of Biomedical Phase VII investor funds as collateral for the personal line of credit. He subsequently used the line to pay approximately $6 million of his personal taxes (he funneled the payment through GSI), approximately $3.5 million to Stateside Phase VI construction vendors, and approximately $1.4 million of purported returns to investors in Phases III-VI. As a result, Quiros used nearly all of the $10.7 million in Biomedical Phase VII investor funds he transferred to back the line of credit. These funds are therefore not available for use on the Biomedical Phase VII project unless Quiros comes up with $10.7 million to pay down the line of credit.

### 4. The Trump Place Luxury Condominium

137. On April 12, 2013, Quiros transferred $3 million in Biomedical Phase VII investor funds to GSI. Six weeks later, on May 30, 2013, he used $2.2 million of that money to buy a luxury condominium at Trump Place in New York City.

### 5. Q Burke Mountain Resort

138. Q Burke is the owner of the Burke Mountain Resort, a ski resort in East Burke, Vermont, which is the site of another EB-5 offering that Quiros is promoting called Q Burke Mountain Resort. Quiros and Stenger are trying to raise $98 million from the Q Burke EB-5 offering, and to date have raised approximately $53 million. As described above, Quiros improperly used approximately $7 million from the last margin loan (collateralized by investor funds) to purchase Q Burke. He subsequently used approximately $18.2 million of Biomedical Phase VII investor funds as part of the $19 million pay off of this margin loan (to replace in part the funds he had spent to buy Q Burke).

43

### 6. Misrepresentations To The State Of Vermont

139.    To attempt to cover up their extensive misappropriation and misuse of investor funds, the Biomedical Phase VII Defendants have misrepresented to State of Vermont regulators how they have been spending investor funds.  In documents they provided to state officials in March 2015, the Defendants claim they have sent $24.5 million to an affiliated Korean firm for equipment, distribution, and marketing rights.    Those same documents further state that Biomedical Phase VII has $21 million of investor funds in operating accounts.

140.    However, financial records for JCM, Biomedical Phase VII, AnC Bio Vermont GP Services, and the project sponsor show the Defendants have at most sent $8 million to the Korean firm and have nowhere near $21 million in Phase VII accounts.

## D.  The Status Of Biomedical Phase VII

141.    As of Sept. 30, 2015, Quiros, Stenger, Biomedical Phase VII, Jay Peak, and Q Resorts have raised at least $83 million from Biomedical Phase VII investors.  Of this amount, the Defendants have taken $69 million, while the remaining $14 million remains in escrow. However, they have done very little work on the project – just site preparation and minimal groundbreaking.  In total, they have spent only approximately $10 million of the $69 million on Biomedical Phase VII vendors and related project costs.

142.    Biomedical Phase VII documents show the company needs an additional $84 million to complete the project.  However, there is only about $5.2 million remaining in non-escrow accounts associated with the Biomedical Phase VII project, and the aforementioned $14 million in escrow.  Furthermore, the Defendants can only raise an additional $27 million from new Biomedical Phase VII investors before the offering is fully subscribed.  Hence, with only $41 million in available funds but at least $84 million in expenses remaining, the Defendants are

at least $43 million short of the funds needed to complete the research facility. As with the Stateside Phase VI project, if Biomedical Phase VII is not completed – and the project appears in grave danger of not being built – the 166 investors who have already made their investment will not realize their promised return, will likely lose their investments, and will likely lose their opportunity to obtain permanent green cards.

## X. THE DEFENDANTS' CONTINUED FUNDRAISING

143. The Defendants continue to raise money through additional EB-5 projects, as well as in Biomedical Phase VII. As discussed above, Quiros, with the assistance of Stenger, continues to solicit investors for the $98 million Q Burke project.

144. The Defendants also continue to solicit new investors for the remaining subscriptions available in Biomedical Phase VII. To that end, Stenger and the other members of the Jay Peak organization regularly travel around the world in search of new investors. In the last few months, Stenger and others (including Quiros on occasion), have traveled to Vietnam, Dubai, Istanbul, Hong Kong, Singapore, and South America.

145. The Defendants also make presentations in this country, including at recent immigration conferences and events in Las Vegas and Dallas.

146. At these events and in other solicitations, the Defendants continue to make misrepresentations and omissions to investors. The State of Vermont directed Biomedical Phase VII to stop raising money in June 2014 due to questions over its offering materials. Ultimately, the Biomedical Phase VII defendants began soliciting new investors with revised offering materials in 2015, but were not allowed to have new invested funds released from escrow until they completed a financial review, which they have not completed. However, the revised offering materials still contain misrepresentations and omissions.

45

147.    The most glaring example is the fact that the revised offering materials do not

mention the significant shortfall in funds needed to complete the biomedical research facility, as

well as the misuse and misappropriation of investor funds detailed in this Complaint.    In

addition, the revised offering documents continue to project that Biomedical Phase VII will start

realizing revenue as soon as this year for some of its products, and will realize more than $600

million in revenues by 2020 – even though Biomedical Phase VII is years away both from

obtaining FDA approval for its products and completing the research facility (and in fact does

not currently have the money to build the facility).    Thus, Quiros, Stenger, and the other Phase

VII Defendants continue to put new investor money as well as existing investor funds at risk.

148.    Moreover, Quiros wants to raise at least another $400 million from investors

through future EB-5 offerings and is planning on using funds from these new offerings to help

complete Phases VI and VII.

## XI.  CLAIMS FOR RELIEF

## SUITES PHASE I

## COUNT 1

### Section 17(a)(1) of the Securities Act
### (Against Suites I, Jay Peak Management, Jay Peak, Q Resorts, Quiros, and Stenger)

149.    The Commission repeats and realleges Paragraphs 1-148 of this Complaint as if

fully set forth herein.

150.    Defendants Suites Phase I, Jay Peak Management, Jay Peak, Q Resorts, Quiros,

and Stenger, in the offer or sale of securities by use of any means or instruments of transportation

or communication in interstate commerce or by use of the mails, directly or indirectly employed

devices, schemes, or artifices to defraud.

151.    By reason of the foregoing, Suites Phase I, Jay Peak Management, Jay Peak, Q

46

Resorts, Quiros, and Stenger violated, and unless enjoined, are reasonably likely to continue to violate, Section 17(a)(1) of the Securities Act, 15 U.S.C. § 77q(a)(1).

## COUNT 2

### Section 17(a)(3) of the Securities Act
**(Against Suites Phase I, Jay Peak Management, Jay Peak, Q Resorts, Quiros, and Stenger)**

152.    The Commission repeats and realleges Paragraphs 1-148 of this Complaint as if fully set forth herein.

153.    Defendants Suites Phase I, Jay Peak Management, Jay Peak, Q Resorts, Quiros, and Stenger, in the offer or sale of securities by use of any means or instruments of transportation or communication in interstate commerce or by use of the mails, directly or indirectly engaged in transactions, practices, or courses of business which operated or would have operated as a fraud or deceit upon the purchasers.

154.    By reason of the foregoing, Suites Phase I, Jay Peak Management, Jay Peak, Q Resorts, Quiros, and Stenger violated, and unless enjoined, are reasonably likely to continue to violate, Section 17(a)(3) of the Securities Act, 15 U.S.C. § 77q(a)(3).

## COUNT 3

### Section 10(b) and Rule 10b-5(a) of the Exchange Act
**(Against Suites Phase I, Jay Peak Management, Jay Peak, Q Resorts, Quiros, and Stenger)**

155.    The Commission repeats and realleges Paragraphs 1-148 of this Complaint as if fully set forth herein.

156.    Defendants Suites Phase I, Jay Peak Management, Jay Peak, Q Resorts, Quiros, and Stenger, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails, employed devices, schemes or artifices to defraud in connection with the purchase or sale of securities.

47

157.    By reason of the foregoing, Suites Phase I, Jay Peak Management, Jay Peak, Q Resorts, Quiros, and Stenger violated, and unless enjoined, are reasonably likely to continue to violate, Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Exchange Act Rule 10b-5(a), 17 C.F.R. § 240.10b-5(a).

## COUNT 4

### Section 10(b) and Rule 10b-5(c) of the Exchange Act
### (Against Suites Phase I, Jay Peak Management, Jay Peak, Q Resorts, Quiros, and Stenger)

158.    The Commission repeats and realleges Paragraphs 1-148 of this Complaint as if fully set forth herein.

159.    Defendants Suites Phase I, Jay Peak Management, Jay Peak, Q Resorts, Quiros, and Stenger, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails, engaged in acts, practices, and courses of business which have operated, are now operating and will operate as a fraud upon the purchasers of such securities.

160.    By reason of the foregoing, Suites Phase I, Jay Peak Management, Jay Peak, Q Resorts, Quiros, and Stenger violated, and unless enjoined, are reasonably likely to continue to violate, Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Exchange Act Rule 10b-5(c), 17 C.F.R. § 240.10b-5(c).

## COUNT 5

### Section 20(a) – Control Person Liability
### For Suites Phase I and Jay Peak Management's Violations Of The Exchange Act
### (Against Quiros)

161.    The Commission repeats and realleges Paragraphs 1-148 of this Complaint as if fully set forth herein.

162.    Beginning no later than June 23, 2008, Quiros has been, directly or indirectly, a control person of Suites Phase I and Jay Peak Management for purposes of Section 20(a) of the

Exchange Act, 15 U.S.C. § 78t(a).

163. Beginning no later than June 23, 2008, Suites Phase I and Jay Peak Management violated Section 10(b) and Rule 10b-5 of the Exchange Act.

164. As a control person of Suites Phase I and Jay Peak Management, Quiros is jointly and severally liable with and to the same extent as Suites Phase I and Jay Peak Management for each of their violations of the Section 10(b) and Rule 10b-5 of the Exchange Act.

165. By reason of the foregoing, Quiros directly and indirectly violated, and unless enjoined, is reasonably likely to continue to violate, Sections 10(b) and 20(a) and Rule 10b-5 of the Exchange Act, 15 U.S.C. § 78j(b) and § 78t(a), and 17 C.F.R. § 240.10b-5.

## HOTEL PHASE II

### COUNT 6

#### Section 17(a)(1) of the Securities Act
**(Against Hotel Phase II, Jay Peak Management, Jay Peak, Q Resorts, Quiros, and Stenger)**

166. The Commission repeats and realleges Paragraphs 1-148 of this Complaint as if fully set forth herein.

167. Defendants Hotel Phase II, Jay Peak Management, Jay Peak, Q Resorts, Quiros, and Stenger, in the offer or sale of securities by use of any means or instruments of transportation or communication in interstate commerce or by use of the mails, directly or indirectly employed devices, schemes, or artifices to defraud.

168. By reason of the foregoing, Hotel Phase II, Jay Peak Management, Jay Peak, Q Resorts, Quiros, and Stenger violated, and unless enjoined, are reasonably likely to continue to violate, Section 17(a)(1) of the Securities Act, 15 U.S.C. § 77q(a)(1).

### COUNT 7

#### Section 17(a)(2) of the Securities Act

**(Against Hotel Phase II, Jay Peak Management, Jay Peak, Q Resorts, Quiros, and Stenger)**

169.    The Commission repeats and realleges Paragraphs 1-17, 28-98, 115, and 142-148 of this Complaint as if fully set forth herein.

170.    Defendants Hotel Phase II, Jay Peak Management, Jay Peak, Q Resorts, Quiros, and Stenger, in the offer or sale of securities by use of any means or instruments of transportation or communication in interstate commerce or by use of the mails, directly or indirectly obtained money or property by means of untrue statements of material facts and omissions to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading.

171.    By reason of the foregoing, Hotel Phase II, Jay Peak Management, Jay Peak, Q Resorts, Quiros, and Stenger violated, and unless enjoined, are reasonably likely to continue to violate, Section 17(a)(2) of the Securities Act, 15 U.S.C. § 77q(a)(2).

## COUNT 8

### Section 17(a)(3) of the Securities Act
**(Against Hotel Phase II, Jay Peak Management, Jay Peak, Q Resorts, Quiros, and Stenger)**

172.    The Commission repeats and realleges Paragraphs 1-148 of this Complaint as if fully set forth herein.

173.    Defendants Hotel Phase II, Jay Peak Management, Jay Peak, Q Resorts, Quiros, and Stenger, in the offer or sale of securities by use of any means or instruments of transportation or communication in interstate commerce or by use of the mails, directly or indirectly engaged in transactions, practices, or courses of business which operated or would have operated as a fraud or deceit upon the purchasers.

174.    By reason of the foregoing, Hotel Phase II, Jay Peak Management, Jay Peak, Q Resorts, Quiros, and Stenger violated, and unless enjoined, are reasonably likely to continue to

violate, Section 17(a)(3) of the Securities Act, 15 U.S.C. § 77q(a)(3).

## COUNT 9

### Section 10(b) and Rule 10b-5(a) of the Exchange Act
### (Against Hotel Phase II, Jay Peak Management, Jay Peak, Q Resorts, Quiros, and Stenger)

175.    The Commission repeats and realleges Paragraphs 1-148 of this Complaint as if fully set forth herein.

176.    Defendants Hotel Phase II, Jay Peak Management, Jay Peak, Q Resorts, Quiros, and Stenger, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails, employed devices, schemes or artifices to defraud in connection with the purchase or sale of securities.

177.    By reason of the foregoing, Hotel Phase II, Jay Peak Management, Jay Peak, Q Resorts, Quiros, and Stenger violated, and unless enjoined, are reasonably likely to continue to violate Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Exchange Act Rule 10b-5(a), 17 C.F.R. § 240.10b-5(a).

## COUNT 10

### Section 10(b) and Rule 10b-5(b) of the Exchange Act
### (Against Hotel Phase II, Jay Peak Management, Jay Peak, and Stenger)

178.    The Commission repeats and realleges Paragraphs 1-17, 28-98, 115, and 142-148 of this Complaint as if fully set forth herein.

179.    Defendants Hotel Phase II, Jay Peak Management, Jay Peak, and Stenger, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails, made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading.

51

180.    By reason of the foregoing, Hotel Phase II, Jay Peak Management, Jay Peak, and

Stenger violated, and unless enjoined, are reasonably likely to continue to violate Section 10(b)

of the Exchange Act, 15 U.S.C. § 78j(b), and Exchange Act Rule 10b-5(b), 17 C.F.R. § 240.10b-

5(b).

## COUNT 11

### Section 10(b) and Rule 10b-5(c) of the Exchange Act
### (Against Hotel Phase II, Jay Peak Management, Jay Peak, Q Resorts, Quiros, and Stenger)

181.    The Commission repeats and realleges Paragraphs 1-148 of this Complaint as if

fully set forth herein.

182.    Defendants Hotel Phase II, Jay Peak Management, Jay Peak, Q Resorts, Quiros,

and Stenger, directly or indirectly, by the use of any means or instrumentality of interstate

commerce, or of the mails, engaged in acts, practices, and courses of business which have

operated, are now operating and will operate as a fraud upon the purchasers of such securities.

183.    By reason of the foregoing, Hotel Phase II, Jay Peak Management, Jay Peak, Q

Resorts, Quiros, and Stenger violated, and unless enjoined, are reasonably likely to continue to

violate Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Exchange Act Rule 10b-5(c),

17 C.F.R. § 240.10b-5(c).

## COUNT 12

### Section 20(a) – Control Person Liability
### For Hotel Phase II and Jay Peak Management's Violations Of The Exchange Act
### (Against Quiros)

184.    The Commission repeats and realleges Paragraphs 1-148 of this Complaint as if

fully set forth herein.

185.    Beginning no later than June 23, 2008, Quiros has been, directly or indirectly, a

control person of Hotel Phase II and Jay Peak Management for purposes of Section 20(a) of the

Exchange Act, 15 U.S.C. § 78t(a).

186.    Beginning no later than June 23, 2008, Hotel Phase II and Jay Peak Management violated Section 10(b) and Rule 10b-5 of the Exchange Act.

187.    As a control person of Hotel Phase II and Jay Peak Management, Quiros is jointly and severally liable with and to the same extent as Hotel Phase II and Jay Peak Management for each of their violations of Section 10(b) and Rule 10b-5 of the Exchange Act.

188.    By reason of the foregoing, Quiros, directly and indirectly violated, and unless enjoined, is reasonably likely to continue to violate, Sections 10(b) and 20(a) and Rule 10b-5 of the Exchange Act, 15 U.S.C. § 78j(b) and § 78t(a), and 17 C.F.R. § 240.10b-5.

## COUNT 13

### Aiding and Abetting Hotel Phase II, Jay Peak Management, Jay Peak, and Stenger's Violations Of Section 10(b) and Rule 10b-5(b) of the Exchange Act (Against Quiros and Q Resorts)

189.    The Commission repeats and realleges Paragraphs 1-17, 28-98, 115, and 142-148 of this Complaint as if fully set forth herein.

190.    From no later than June 2008, Hotel Phase II, Jay Peak Management, Jay Peak, and Stenger each, directly or indirectly, by use of the means and instrumentalities of interstate commerce, and of the mails in connection with the purchase or sale of securities, knowingly, willfully or recklessly made untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, in violation of Section 10(b) of the Exchange Act and Rule 10b-5(b), 15 U.S.C. § 78j(b) and 17 C.F.R. § 240.10b-5(b).

191.    Quiros and Q Resorts knowingly or recklessly substantially assisted those four Defendants' violations of Section 10(b) and Rule 10b-5(b) of the Exchange Act.

53

192.    By reason of the foregoing, Quiros and Q Resorts, directly or indirectly, violated, and unless enjoined, are reasonably likely to continue to violate, Section 10(b) and Rule 10b-5(b) of the Exchange, 15 U.S.C. § 78j(b) and 17 C.F.R. § 240.10b-5(b).

### PENTHOUSE PHASE III

### COUNT 14

#### Section 17(a)(1) of the Securities Act
#### (Against Penthouse Phase III, Jay Peak GP Services, Jay Peak, Q Resorts, Quiros, and Stenger)

193.    The Commission repeats and realleges Paragraphs 1-148 of this Complaint as if fully set forth herein.

194.    Defendants Penthouse Phase III, Jay Peak GP Services, Jay Peak, Q Resorts, Quiros, and Stenger, in the offer or sale of securities by use of any means or instruments of transportation or communication in interstate commerce or by use of the mails, directly or indirectly employed devices, schemes, or artifices to defraud.

195.    By reason of the foregoing, Penthouse Phase III, Jay Peak GP Services, Jay Peak, Q Resorts, Quiros, and Stenger violated, and unless enjoined, are reasonably likely to continue to violate, Section 17(a)(1) of the Securities Act, 15 U.S.C. § 77q(a)(1).

### COUNT 15

#### Section 17(a)(2) of the Securities Act
#### (Against Penthouse Phase III, Jay Peak GP Services, Jay Peak, Q Resorts, Quiros, and Stenger)

196.    The Commission repeats and realleges Paragraphs 1-14, 18-19, 28-56, 78-95, 99-102, 115, and 142-148 of this Complaint as if fully set forth herein.

197.    Defendants Penthouse Phase III, Jay Peak GP Services,  Jay Peak, Q Resorts, Quiros, and Stenger, in the offer or sale of securities by use of any means or instruments of

transportation or communication in interstate commerce or by use of the mails, directly or indirectly obtained money or property by means of untrue statements of material facts and omissions to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading.

198.   By reason of the foregoing, Penthouse Phase III, Jay Peak GP Services, Jay Peak, Q Resorts, Quiros, and Stenger violated, and unless enjoined, are reasonably likely to continue to violate, Section 17(a)(2) of the Securities Act, 15 U.S.C. § 77q(a)(2).

### COUNT 16

### Section 17(a)(3) of the Securities Act
### (Against Penthouse Phase III, Jay Peak GP Services, Jay Peak, Q Resorts, Quiros, and Stenger)

199.   The Commission repeats and realleges Paragraphs 1-148 of this Complaint as if fully set forth herein.

200.   Defendants Penthouse Phase III, Jay Peak GP Services, Jay Peak, Q Resorts, Quiros, and Stenger, in the offer or sale of securities by use of any means or instruments of transportation or communication in interstate commerce or by use of the mails, directly or indirectly engaged in transactions, practices, or courses of business which operated or would have operated as a fraud or deceit upon the purchasers.

201.   By reason of the foregoing, Penthouse Phase III, Jay Peak GP Services, Jay Peak, Q Resorts, Quiros, and Stenger violated, and unless enjoined, are reasonably likely to continue to violate, Section 17(a)(3) of the Securities Act, 15 U.S.C. § 77q(a)(3).

### COUNT 17

### Section 10(b) and Rule 10b-5(a) of the Exchange Act
### (Against Penthouse Phase III, Jay Peak GP Services, Jay Peak, Q Resorts, Quiros, and Stenger)

202.    The Commission repeats and realleges Paragraphs 1-148 of this Complaint as if fully set forth herein.

203.    Defendants Penthouse Phase III, Jay Peak GP Services, Jay Peak, Q Resorts, Quiros, and Stenger, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails, employed devices, schemes or artifices to defraud in connection with the purchase or sale of securities.

204.    By reason of the foregoing, Penthouse Phase III, Jay Peak GP Services, Jay Peak, Q Resorts, Quiros, and Stenger violated and, unless enjoined, are reasonably likely to continue to violate Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Exchange Act Rule 10b-5(a), 17 C.F.R. § 240.10b-5(a).

## COUNT 18

### Section 10(b) and Rule 10b-5(b) of the Exchange Act
### (Against Penthouse Phase III, Jay Peak GP Services, Jay Peak, and Stenger)

205.    The Commission repeats and realleges Paragraphs 1-14, 18-19, 28-56, 78-95, 99-102, 115, and 142-148 of this Complaint as if fully set forth herein.

206.    Defendants Penthouse Phase III, Jay Peak GP Services, Jay Peak, Q Resorts, Quiros, and Stenger, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails, made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading.

207.    By reason of the foregoing, Penthouse Phase III, Jay Peak GP Services, Jay Peak, Q Resorts, Quiros, and Stenger violated, and unless enjoined, are reasonably likely to continue to violate, Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Exchange Act Rule 10b-5(b), 17 C.F.R. § 240.10b-5(b).

## COUNT 19

### Section 10(b) and Rule 10b-5(c) of the Exchange Act
**(Against Penthouse Phase III, Jay Peak GP Services, Jay Peak, Q Resorts, Quiros, and Stenger)**

208.    The Commission repeats and realleges Paragraphs 1-148 of this Complaint as if fully set forth herein.

209.    Defendants Penthouse Phase III, Jay Peak GP Services, Jay Peak, Q Resorts, Quiros, and Stenger, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails, engaged in acts, practices, and courses of business which have operated, are now operating and will operate as a fraud upon the purchasers of such securities.

210.    By reason of the foregoing, Penthouse Phase III, Jay Peak GP Services,  Jay Peak, Q Resorts, Quiros, and Stenger violated, and unless enjoined, are reasonably likely to continue to violate, Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Exchange Act Rule 10b-5(c), 17 C.F.R. § 240.10b-5(c).

## COUNT 20

### Section 20(a) – Control Person Liability
**For Penthouse Phase III and Jay Peak GP Services' Violations Of The Exchange Act**
**(Against Quiros)**

211.    The Commission repeats and realleges Paragraphs 1-148 of this Complaint as if fully set forth herein.

212.    Beginning no later than July 2010, Quiros has been, directly or indirectly, a control person of Penthouse Phase III and Jay Peak GP Services for purposes of Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a).

213.    Beginning no later than July 2010, Penthouse Phase III and Jay Peak GP Services

57

violated Section 10(b) and Rule 10b-5 of the Exchange Act.

214.    As a control person of Penthouse Phase III and Jay Peak GP Services, Quiros is

jointly and severally liable with and to the same extent as Penthouse Phase III and Jay Peak GP

Services for each of their violations of Section 10(b) and Rule 10b-5 of the Exchange Act.

215.    By reason of the foregoing, Quiros, directly and indirectly violated, and unless

enjoined, is reasonably likely to continue to violate, Sections 10(b) and 20(a) and Rule 10b-5 of

the Exchange Act, 15 U.S.C. § 78j(b) and § 78t(a), and 17 C.F.R. § 240.10b-5.

**COUNT 21**

**Aiding and Abetting Penthouse Phase III, Jay Peak GP Services, Jay Peak, and Stenger's
Violations Of Section 10(b) of the Exchange Act and Rule 10b-5(b)
(Against Quiros and Q Resorts)**

216.    The Commission repeats and realleges Paragraphs 1-14, 18-19, 28-56, 78-95, 99-

102, 115, and 142-148 above of this Complaint as if fully set forth herein.

217.    From no later than July 2010, Penthouse Phase III, Jay Peak GP Services, Jay

Peak, and Stenger each, directly or indirectly, by use of the means and instrumentalities of

interstate commerce, and of the mails in connection with the purchase or sale of securities,

knowingly, willfully or recklessly made untrue statements of material facts and omitted to state

material facts necessary in order to make the statements made, in light of the circumstances

under which they were made, not misleading, in violation of Section 10(b) of the Exchange Act

and Rule 10b-5(b), 15 U.S.C. § 78j(b) and 17 C.F.R. § 240.10b-5(b).

218.    Quiros and Q Resorts knowingly or recklessly substantially assisted those four

Defendants' violations of Section 10(b) and Rule 10b-5(b) of the Exchange Act.

219.    By reason of the foregoing, Quiros and Q Resorts, directly or indirectly, violated,

and unless enjoined, are reasonably likely to continue to violate, Section 10(b) and Rule 10b-5(b)

58

of the Exchange, 15 U.S.C. § 78j(b) and 17 C.F.R. § 240.10b-5(b).

## GOLF AND MOUNTAIN PHASE IV

### COUNT 22

#### Section 17(a)(1) of the Securities Act
**(Against Golf and Mountain Phase IV, Jay Peak GP Services Golf, Jay Peak, Q Resorts, Quiros, and Stenger)**

220.    The Commission repeats and realleges Paragraphs 1-148 of this Complaint as if fully set forth herein.

221.    Defendants Golf and Mountain Phase IV, Jay Peak GP Services Golf, Jay Peak, Q Resorts, Quiros, and Stenger, in the offer or sale of securities by use of any means or instruments of transportation or communication in interstate commerce or by use of the mails, directly or indirectly employed devices, schemes, or artifices to defraud.

222.    By reason of the foregoing, Golf and Mountain Phase IV, Jay Peak GP Services Golf, Jay Peak, Q Resorts, Quiros, and Stenger violated, and unless enjoined, are reasonably likely to continue to violate, Section 17(a)(1) of the Securities Act, 15 U.S.C. § 77q(a)(1).

### COUNT 23

#### Section 17(a)(2) of the Securities Act
**(Against Golf and Mountain Phase IV, Jay Peak GP Services Golf, Jay Peak, Q Resorts, Quiros, and Stenger)**

223.    The Commission repeats and realleges Paragraphs 1-14, 20-21, 28-56, 78-95, 103-106, 115, and 142-148 of this Complaint as if fully set forth herein.

224.    Defendants Golf and Mountain Phase IV, Jay Peak GP Services Golf, Jay Peak, Q Resorts, Quiros, and Stenger, in the offer or sale of securities by use of any means or instruments of transportation or communication in interstate commerce or by use of the mails, directly or indirectly obtained money or property by means of untrue statements of material facts and

omissions to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading.

225.    By reason of the foregoing, Golf and Mountain Phase IV, Jay Peak GP Services Golf,  Jay Peak, Q Resorts, Quiros, and Stenger violated, and unless enjoined, are reasonably likely to continue to violate, Section 17(a)(2) of the Securities Act, 15 U.S.C. § 77q(a)(2).

### COUNT 24

#### Section 17(a)(3) of the Securities Act
#### (Against Golf and Mountain Phase IV, Jay Peak GP Services Golf, Jay Peak, Q Resorts, Quiros, and Stenger)

226.    The Commission repeats and realleges Paragraphs 1-148 of this Complaint as if fully set forth herein.

227.    Defendants Golf and Mountain Phase IV, Jay Peak GP Services Golf, Jay Peak, Q Resorts, Quiros, and Stenger, in the offer or sale of securities by use of any means or instruments of transportation or communication in interstate commerce or by use of the mails, directly or indirectly engaged in transactions, practices, or courses of business which operated or would have operated as a fraud or deceit upon the purchasers.

228.    By reason of the foregoing, Golf and Mountain Phase IV, Jay Peak GP Services Golf, Jay Peak, Q Resorts, Quiros, and Stenger violated, and unless enjoined, are reasonably likely to continue to violate, Section 17(a)(3) of the Securities Act, 15 U.S.C. § 77q(a)(3).

### COUNT 25

#### Section 10(b) and Rule 10b-5(a) of the Exchange Act
#### (Against Golf and Mountain Phase IV, Jay Peak GP Services Golf, Jay Peak, Q Resorts, Quiros, and Stenger)

229.    The Commission repeats and realleges Paragraphs 1-148 of this Complaint as if fully set forth herein.

230.     Defendants Golf and Mountain Phase IV, Jay Peak GP Services Golf, Jay Peak, Q Resorts, Quiros, and Stenger, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails, employed devices, schemes or artifices to defraud in connection with the purchase or sale of securities.

231.     By reason of the foregoing, Golf and Mountain Phase IV, Jay Peak GP Services Golf, Jay Peak, Q Resorts, Quiros, and Stenger violated, and unless enjoined, are reasonably likely to continue to violate, Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Exchange Act Rule 10b-5(a), 17 C.F.R. § 240.10b-5(a).

### COUNT 26

#### Section 10(b) and Rule 10b-5(b) of the Exchange Act
**(Against Golf and Mountain Phase IV, Jay Peak GP Services Golf, Jay Peak, and Stenger)**

232.   The Commission repeats and realleges Paragraphs 1-14, 20-21, 28-56, 78-95, 103-106, 115, and 142-148 of this Complaint as if fully set forth herein,

233.     Defendants Golf and Mountain Phase IV, Jay Peak GP Services Golf, Jay Peak, and Stenger, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails, made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading.

234.     By reason of the foregoing, Golf and Mountain Phase IV, Jay Peak GP Services Golf, Jay Peak, and Stenger violated, and unless enjoined, are reasonably likely to continue to violate, Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Exchange Act Rule 10b-5(b), 17 C.F.R. § 240.10b-5(b).

## COUNT 27

### Section 10(b) and Rule 10b-5(c) of the Exchange Act
**(Against Golf and Mountain Phase IV, Jay Peak GP Services Golf, Jay Peak, Q Resorts, Quiros, and Stenger)**

235.    The Commission repeats and realleges Paragraphs 1-148 of this Complaint as if fully set forth herein.

236.    Defendants Golf and Mountain Phase IV, Jay Peak GP Services Golf, Jay Peak, Q Resorts, Quiros, and Stenger, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails, engaged in acts, practices, and courses of business which have operated, are now operating and will operate as a fraud upon the purchasers of such securities.

237.    By reason of the foregoing, Golf and Mountain Phase IV, Jay Peak GP Services Golf, Jay Peak, Q Resorts, Quiros, and Stenger violated, and unless enjoined, are reasonably likely to continue to violate, Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Exchange Act Rule 10b-5(c), 17 C.F.R. § 240.10b-5(c).

## COUNT 28

### Section 20(a) – Control Person Liability
**For Golf and Mountain Phase IV and Jay Peak GP Services Golf's Violations Of The Exchange Act (Against Quiros)**

238.    The Commission repeats and realleges Paragraphs 1-148 of this Complaint as if fully set forth herein.

239.    Beginning no later than December 2010, Quiros has been, directly or indirectly, a control person of Golf and Mountain Phase IV and Jay Peak GP Services Golf for purposes of Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a).

240.    Beginning no later than December 2010, Golf and Mountain Phase IV and Jay

Peak GP Services Golf violated Section 10(b) and Rule 10b-5 of the Exchange Act.

241.    As a control person of Golf and Mountain Phase IV and Jay Peak GP Services
Golf, Quiros is jointly and severally liable with and to the same extent as Golf and Mountain
Phase IV and Jay Peak GP Services Golf for each of their violations of Section 10(b) and Rule
10b-5 of the Exchange Act.

242.    By reason of the foregoing, Quiros, directly and indirectly violated, and unless
enjoined, is reasonably likely to continue to violate, Sections 10(b) and 20(a) and Rule 10b-5 of
the Exchange Act, 15 U.S.C. § 78j(b) and § 78t(a), and 17 C.F.R. § 240.10b-5.

### COUNT 29

### Aiding and Abetting Golf and Mountain Phase IV, Jay Peak GP Services Golf, Jay Peak, and Stenger's Violations Of Section 10(b) of the Exchange Act and Rule 10b-5(b) (Against Quiros and Q Resorts)

243.    The Commission repeats and realleges Paragraphs 1-14, 20-21, 28-56, 78-95,
103-106, 115, and 142-148 of this Complaint as if fully set forth herein.

244.    From no later than December 2010, Golf and Mountain Phase IV, Jay Peak GP
Services Golf, Jay Peak, and Stenger each, directly or indirectly, by use of the means and
instrumentalities of interstate commerce, and of the mails in connection with the purchase or sale
of securities, knowingly, willfully or recklessly made untrue statements of material facts and
omitted to state material facts necessary in order to make the statements made, in light of the
circumstances under which they were made, not misleading, in violation of Section 10(b) of the
Exchange Act and Rule 10b-5(b), 15 U.S.C. § 78j(b) and 17 C.F.R. § 240.10b-5(b).

245.    Quiros and Q Resorts knowingly or recklessly substantially assisted those four
Defendants' violations of Section 10(b) and Rule 10b-5(b) of the Exchange Act.

246.    By reason of the foregoing, Quiros and Q Resorts, directly or indirectly, violated,

and unless enjoined, are reasonably likely to continue to violate, Section 10(b) and Rule 10b-5(b) of the Exchange, 15 U.S.C. § 78j(b) and 17 C.F.R. § 240.10b-5(b).

## LODGE AND TOWNHOUSES PHASE V

### COUNT 30

### Section 17(a)(1) of the Securities Act
**(Against Lodge and Townhouses Phase V, Jay Peak GP Services Lodge, Jay Peak, Q Resorts, Quiros, and Stenger)**

247. The Commission repeats and realleges Paragraphs 1-148 of this Complaint as if fully set forth herein.

248. Defendants Lodge and Townhouses Phase V, Jay Peak GP Services Lodge, Jay Peak, Q Resorts, Quiros, and Stenger, in the offer or sale of securities by use of any means or instruments of transportation or communication in interstate commerce or by use of the mails, directly or indirectly employed devices, schemes, or artifices to defraud.

249. By reason of the foregoing, Lodge and Townhouses Phase V, Jay Peak GP Services Lodge, Jay Peak, Q Resorts, Quiros, and Stenger violated, and unless enjoined, are reasonably likely to continue to violate, Section 17(a)(1) of the Securities Act, 15 U.S.C. § 77q(a)(1).

### COUNT 31

### Section 17(a)(2) of the Securities Act
**(Against Lodge and Townhouses Phase V, Jay Peak GP Services Lodge, Jay Peak, Q Resorts, Quiros, and Stenger)**

250. The Commission repeats and realleges Paragraphs 1-14, 22-23, 28-56, 78-95, 107-110, 115, and 142-148 of this Complaint as if fully set forth herein.

251. Defendants Lodge and Townhouses Phase V, Jay Peak GP Services Lodge, Jay Peak, Q Resorts, Quiros, and Stenger, in the offer or sale of securities by use of any means or

instruments of transportation or communication in interstate commerce or by use of the mails, directly or indirectly obtained money or property by means of untrue statements of material facts and omissions to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading.

252.     By reason of the foregoing, Lodge and Townhouses Phase V, Jay Peak GP Services Lodge, Jay Peak, Q Resorts, Quiros, and Stenger violated, and unless enjoined, are reasonably likely to continue to violate, Section 17(a)(2) of the Securities Act, 15 U.S.C. § 77q(a)(2).

## COUNT 32

### Section 17(a)(3) of the Securities Act
### (Against Lodge and Townhouses Phase V, Jay Peak GP Services Lodge, Jay Peak, Q Resorts, Quiros, and Stenger)

253.     The Commission repeats and realleges Paragraphs 1-148 of this Complaint as if fully set forth herein.

254.     Defendants Lodge and Townhouses Phase V, Jay Peak GP Services Lodge, Jay Peak, Q Resorts, Quiros, and Stenger, in the offer or sale of securities by use of any means or instruments of transportation or communication in interstate commerce or by use of the mails, directly or indirectly engaged in transactions, practices, or courses of business which operated or would have operated as a fraud or deceit upon the purchasers.

255.     By reason of the foregoing, Lodge and Townhouses Phase V, Jay Peak GP Services Lodge, Jay Peak, Q Resorts, Quiros, and Stenger violated, and, unless enjoined, are reasonably likely to continue to violate, Section 17(a)(3) of the Securities Act, 15 U.S.C. § 77q(a)(3).

## COUNT 33

### Section 10(b) and Rule 10b-5(a) of the Exchange Act
**(Against Lodge and Townhouses Phase V, Jay Peak GP Services Lodge, Jay Peak,
Q Resorts, Quiros, and Stenger)**

256.    The Commission repeats and realleges Paragraphs 1-148 of this Complaint as if fully set forth herein.

257.    Defendants Lodge and Townhouses Phase V, Jay Peak GP Services Lodge, Jay Peak, Q Resorts, Quiros, and Stenger, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails, employed devices, schemes or artifices to defraud in connection with the purchase or sale of securities.

258.    By reason of the foregoing, Lodge and Townhouses Phase V, Jay Peak GP Services Lodge, Jay Peak, Q Resorts, Quiros, and Stenger violated, and unless enjoined, are reasonably likely to continue to violate, Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Exchange Act Rule 10b-5(a), 17 C.F.R. § 240.10b-5(a).

## COUNT 34

### Section 10(b) and Rule 10b-5(b) of the Exchange Act
**(Against Lodge and Townhouses Phase V, Jay Peak GP Services Lodge,
Jay Peak, and Stenger)**

259.    The Commission repeats and realleges Paragraphs 1-14, 22-23, 28-56, 78-95, 107-110, 115, and 142-148 of this Complaint as if fully set forth herein.

260.    Defendants Lodge and Townhouses Phase V, Jay Peak GP Services Lodge, Jay Peak, and Stenger, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails, made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading.

261.    By reason of the foregoing, Lodge and Townhouses Phase V, Jay Peak GP Services Lodge, Jay Peak, and Stenger violated, and unless enjoined, are reasonably likely to continue to violate, Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Exchange Act Rule 10b-5(b), 17 C.F.R. § 240.10b-5(b).

## COUNT 35

### Section 10(b) and Rule 10b-5(c) of the Exchange Act
### (Against Lodge and Townhouses Phase V, Jay Peak GP Services Lodge, Jay Peak, Q Resorts, Quiros, and Stenger)

262.    The Commission repeats and realleges Paragraphs 1-148 of this Complaint as if fully set forth herein.

263.    Defendants Lodge and Townhouses Phase V, Jay Peak GP Services Lodge, Jay Peak, Q Resorts, Quiros, and Stenger, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails, engaged in acts, practices, and courses of business which have operated, are now operating and will operate as a fraud upon the purchasers of such securities.

264.    By reason of the foregoing, Lodge and Townhouses Phase V, Jay Peak GP Services Lodge, Jay Peak, Q Resorts, Quiros, and Stenger violated, and unless enjoined, are reasonably likely to continue to violate, Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Exchange Act Rule 10b-5(c), 17 C.F.R. § 240.10b-5(c).

## COUNT 36

### Section 20(a) – Control Person Liability
### For Lodge and Townhouses Phase V and Jay Peak GP Services Lodge's Violations Of
### The Exchange Act (Against Quiros)

265.    The Commission repeats and realleges Paragraphs 1-148 of this Complaint as if fully set forth herein.

266.     Beginning no later than May 2011, Quiros has been, directly or indirectly, a
control person of Lodge and Townhouses Phase V and Jay Peak GP Services Lodge for purposes
of Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a).

267.     Beginning no later than May 2011, Lodge and Townhouses Phase V and Jay Peak
GP Services Lodge violated Section 10(b) and Rule 10b-5 of the Exchange Act.

268.     As a control person of Lodge and Townhouses Phase V and Jay Peak GP Services
Lodge, Quiros is jointly and severally liable with and to the same extent as Lodge and
Townhouses Phase V and Jay Peak GP Services Lodge for each of their violations of Section
10(b) and Rule 10b-5 of the Exchange Act.

269.     By reason of the foregoing, Quiros, directly and indirectly violated, and unless
enjoined, is reasonably likely to continue to violate, Sections 10(b) and 20(a) and Rule 10b-5 of
the Exchange Act, 15 U.S.C. § 78j(b) and § 78t(a), and 17 C.F.R. § 240.10b-5.

### COUNT 37

### Aiding and Abetting Lodge and Townhouses Phase V, Jay Peak GP Services Lodge, Jay Peak, and Stenger's Violations Of Section 10(b) of the Exchange Act and Rule 10b-5(b) (Against Quiros and Q Resorts)

270.     The Commission repeats and realleges Paragraphs 1-14, 22-23, 28-56, 78-95, 107-
110, 115, and 142-148 of this Complaint as if fully set forth herein.

271.     From no later than May 2011, Lodge and Townhouses Phase V, Jay Peak GP
Services Lodge, Jay Peak, and Stenger each, directly or indirectly, by use of the means and
instrumentalities of interstate commerce, and of the mails in connection with the purchase or sale
of securities, knowingly, willfully or recklessly made untrue statements of material facts and
omitted to state material facts necessary in order to make the statements made, in light of the
circumstances under which they were made, not misleading, in violation of Section 10(b) of the

Exchange Act and Rule 10b-5(b), 15 U.S.C. § 78j(b) and 17 C.F.R. § 240.10b-5(b).

272. Quiros and Q Resorts knowingly or recklessly substantially assisted those four Defendants' violations of Section 10(b) and Rule 10b-5(b) of the Exchange Act.

273. By reason of the foregoing, Quiros and Q Resorts, directly or indirectly, violated, and unless enjoined, are reasonably likely to continue to violate, Section 10(b) and Rule 10b-5(b) of the Exchange, 15 U.S.C. § 78j(b) and 17 C.F.R. § 240.10b-5(b).

## STATESIDE PHASE VI

### COUNT 38

### Section 17(a)(1) of the Securities Act
**(Against Stateside Phase VI, Jay Peak GP Services Stateside, Jay Peak, Q Resorts, Quiros, and Stenger)**

274. The Commission repeats and realleges Paragraphs 1-148 of this Complaint as if fully set forth herein.

275. Defendants Stateside Phase VI, Jay Peak GP Services Stateside, Jay Peak, Q Resorts, Quiros, and Stenger, in the offer or sale of securities by use of any means or instruments of transportation or communication in interstate commerce or by use of the mails, directly or indirectly employed devices, schemes, or artifices to defraud.

276. By reason of the foregoing, Stateside Phase VI, Jay Peak Services Stateside, Jay Peak, Q Resorts, Quiros, and Stenger violated, and unless enjoined, are reasonably likely to continue to violate, Section 17(a)(1) of the Securities Act, 15 U.S.C. § 77q(a)(1).

### COUNT 39

### Section 17(a)(2) of the Securities Act
**(Against Stateside Phase VI, Jay Peak GP Services Stateside, Jay Peak, Q Resorts, Quiros, and Stenger)**

277. The Commission repeats and realleges Paragraphs 1-14, 24-25, 28-56, 78-95,

111-115, and 142-148 of this Complaint as if fully set forth herein.

278.   Defendants Stateside Phase VI, Jay Peak GP Services Stateside, Jay Peak, Q Resorts, Quiros, and Stenger, in the offer or sale of securities by use of any means or instruments of transportation or communication in interstate commerce or by use of the mails, directly or indirectly obtained money or property by means of untrue statements of material facts and omissions to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading.

279.   By reason of the foregoing, Stateside Phase VI, Jay Peak GP Services Stateside, Jay Peak, Q Resorts, Quiros, and Stenger violated, and unless enjoined, are reasonably likely to continue to violate, Section 17(a)(2) of the Securities Act, 15 U.S.C. § 77q(a)(2).

## COUNT 40

### Section 17(a)(3) of the Securities Act
**(Against Stateside Phase VI, Jay Peak GP Services Stateside, Jay Peak, Q Resorts, Quiros, and Stenger)**

280.   The Commission repeats and realleges Paragraphs 1-148 of this Complaint as if fully set forth herein.

281.   Defendants Stateside Phase VI, Jay Peak GP Services Stateside, Jay Peak, Q Resorts, Quiros, and Stenger, in the offer or sale of securities by use of any means or instruments of transportation or communication in interstate commerce or by use of the mails, directly or indirectly engaged in transactions, practices, or courses of business which operated or would have operated as a fraud or deceit upon the purchasers.

282.   By reason of the foregoing, Stateside Phase VI, Jay Peak GP Services Stateside, Jay Peak, Q Resorts, Quiros, and Stenger violated, and unless enjoined, are reasonably likely to continue to violate, Section 17(a)(3) of the Securities Act, 15 U.S.C. § 77q(a)(3).

## COUNT 41

### Section 10(b) and Rule 10b-5(a) of the Exchange Act
### (Against Stateside Phase VI, Jay Peak GP Services Stateside, Jay Peak, Q Resorts, Quiros, and Stenger)

283.    The Commission adopts by reference Paragraphs 1-148 of this Complaint as if fully set forth herein.

284.    Defendants Stateside Phase VI, Jay Peak GP Services Stateside, Jay Peak, Q Resorts, Quiros, and Stenger, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails, employed devices, schemes or artifices to defraud in connection with the purchase or sale of securities.

285.    By reason of the foregoing, Stateside Phase VI, Jay Peak GP Services Stateside, Jay Peak, Q Resorts, Quiros, and Stenger violated, and unless enjoined, are reasonably likely to continue to violate, Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Exchange Act Rule 10b-5(a), 17 C.F.R. § 240.10b-5(a).

## COUNT 42

### Section 10(b) and Rule 10b-5(b) of the Exchange Act
### (Against Stateside Phase VI, Jay Peak GP Services Stateside, Jay Peak, and Stenger)

286.    The Commission repeats and realleges Paragraphs 1-14, 24-25, 28-56, 78-95, 111-115, and 142-148 of this Complaint as if fully set forth herein.

287.    Defendants Stateside Phase VI, Jay Peak GP Services Stateside, Jay Peak, and Stenger, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails, made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading.

288.    By reason of the foregoing, Stateside Phase VI, Jay Peak GP Services Stateside,

Jay Peak, and Stenger violated, and unless enjoined, are reasonably likely to continue to violate, Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Exchange Act Rule 10b-5(b), 17 C.F.R. § 240.10b-5(b).

## COUNT 43

### Section 10(b) and Rule 10b-5(c) of the Exchange Act
### (Against Stateside Phase VI, Jay Peak GP Services Stateside, Jay Peak, Q Resorts, Quiros, and Stenger)

289.    The Commission repeats and realleges Paragraphs 1-148 of this Complaint as if fully set forth herein.

290.    Defendants Stateside Phase VI, Jay Peak GP Services Stateside, Jay Peak, Q Resorts, Quiros, and Stenger, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails, engaged in acts, practices, and courses of business which have operated, are now operating and will operate as a fraud upon the purchasers of such securities.

291.    By reason of the foregoing, Stateside Phase VI, Jay Peak GP Services Stateside, Jay Peak, Q Resorts, Quiros, and Stenger violated, and unless enjoined, are reasonably likely to continue to violate, Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Exchange Act Rule 10b-5(c), 17 C.F.R. § 240.10b-5(c).

## COUNT 44

### Section 20(a) – Control Person Liability
### For Stateside Phase VI and Jay Peak GP Services Stateside's Violations Of
### The Exchange Act (Against Quiros)

292.    The Commission repeats and realleges Paragraphs 1-148 of this Complaint as if fully set forth herein.

293.    Beginning no later than October 2011, Quiros has been, directly or indirectly, a

control person of Stateside Phase VI and Jay Peak GP Services Stateside for purposes of Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a).

294.   Beginning no later than October 2011, Stateside Phase VI and Jay Peak GP Services Stateside violated Section 10(b) and Rule 10b-5 of the Exchange Act.

295.   As a control person of Stateside Phase VI and Jay Peak GP Services Stateside, Quiros is jointly and severally liable with and to the same extent as Stateside Phase VI and Jay Peak GP Services Stateside for each of their violations of Section 10(b) and Rule 10b-5 of the Exchange Act.

296.   By reason of the foregoing, Quiros, directly and indirectly violated, and unless enjoined, is reasonably likely to continue to violate, Sections 10(b) and 20(a) and Rule 10b-5 of the Exchange Act, 15 U.S.C. § 78j(b) and § 78t(a), and 17 C.F.R. § 240.10b-5.

## COUNT 45

### Aiding and Abetting Stateside and Jay Peak GP Services Stateside's Violations Of Section 10(b) of the Exchange Act and Rule 10b-5(b) (Against Quiros and Q Resorts)

297.   The Commission repeats and realleges Paragraphs 1-14, 24-25, 28-56, 78-95, 111-115, and 142-148 of this Complaint as if fully set forth herein.

298.   From no later than October 2011, Stateside Phase VI, Jay Peak GP Services Stateside, Jay Peak, and Stenger each, directly or indirectly, by use of the means and instrumentalities of interstate commerce, and of the mails in connection with the purchase or sale of securities, knowingly, willfully or recklessly made untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, in violation of Section 10(b) of the Exchange Act and Rule 10b-5(b), 15 U.S.C. § 78j(b) and 17 C.F.R. § 240.10b-5(b).

299.   Quiros and Q Resorts knowingly or recklessly substantially assisted those four

73

Defendants' violations of Section 10(b) and Rule 10b-5(b) of the Exchange Act.

300.   By reason of the foregoing, Quiros and Q Resorts, directly or indirectly, violated,
and unless enjoined, are reasonably likely to continue to violate, Section 10(b) and Rule 10b-5(b)
of the Exchange, 15 U.S.C. § 78j(b) and 17 C.F.R. § 240.10b-5(b).

### BIOMEDICAL PHASE VII

### COUNT 46

### Section 17(a)(1) of the Securities Act
### (Against Biomedical Phase VII, AnC Bio Vermont GP Services, Jay Peak, Q Resorts, Quiros, and Stenger)

301.   The Commission repeats and realleges Paragraphs 1-148 of this Complaint as if
fully set forth herein.

302.   Defendants Biomedical Phase VII, AnC Bio Vermont GP Services, Jay Peak, Q
Resorts, Quiros, and Stenger, in the offer or sale of securities by use of any means or instruments
of transportation or communication in interstate commerce or by use of the mails, directly or
indirectly employed devices, schemes, or artifices to defraud.

303.   By reason of the foregoing, Biomedical, AnC Bio Vermont GP Services, Jay
Peak, Q Resorts, Quiros, and Stenger violated, and unless enjoined, are reasonably likely to
continue to violate, Section 17(a)(1) of the Securities Act, 15 U.S.C. § 77q(a)(1).

### COUNT 47

### Section 17(a)(2) of the Securities Act
### (Against Biomedical Phase VII, AnC Bio Vermont GP Services, Jay Peak, Q Resorts, Quiros, and Stenger)

304.   The Commission repeats and realleges Paragraphs 1-14, 26-56, 78-95, and 115-
148 of this Complaint as if fully set forth herein.

305.   Defendants Biomedical Phase VII, AnC Bio Vermont GP Services, Jay Peak, Q

Resorts, Quiros, and Stenger, in the offer or sale of securities by use of any means or instruments of transportation or communication in interstate commerce or by use of the mails, directly or indirectly obtained money or property by means of untrue statements of material facts and omissions to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading.

306.   By reason of the foregoing, Biomedical Phase VII, AnC Bio Vermont GP Services, Jay Peak, Q Resorts, Quiros, and Stenger violated, and unless enjoined, are reasonably likely to continue to violate, Section 17(a)(2) of the Securities Act, 15 U.S.C. § 77q(a)(2).

### COUNT 48

#### Section 17(a)(3) of the Securities Act
**(Against Biomedical Phase VII, AnC Bio Vermont GP Services, Jay Peak, Q Resorts, Quiros, and Stenger)**

307.   The Commission repeats and realleges Paragraphs 1-148 of this Complaint as if fully set forth herein.

308.   Defendants Biomedical Phase VII, AnC Bio Vermont GP Services, Jay Peak, Q Resorts, Quiros, and Stenger, in the offer or sale of securities by use of any means or instruments of transportation or communication in interstate commerce or by use of the mails, directly or indirectly engaged in transactions, practices, or courses of business which operated or would have operated as a fraud or deceit upon the purchasers.

309.   By reason of the foregoing, Biomedical Phase VII, AnC Bio Vermont GP Services, Jay Peak, Q Resorts, Quiros, and Stenger violated, and unless enjoined, are reasonably likely to continue, to violate Section 17(a)(3) of the Securities Act, 15 U.S.C. § 77q(a)(3).

### COUNT 49

#### Section 10(b) and Rule 10b-5(a) of the Exchange Act
**(Against Biomedical Phase VII, AnC Bio Vermont GP Services, Jay Peak, Q Resorts,**

Quiros, and Stenger)

310.    The Commission repeats and realleges Paragraphs 1-148 of this Complaint as if fully set forth herein.

311.    Defendants Biomedical Phase VII, AnC Bio Vermont GP Services, Jay Peak, Q Resorts, Quiros, and Stenger, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails, employed devices, schemes or artifices to defraud in connection with the purchase or sale of securities.

312.    By reason of the foregoing, Biomedical Phase VII, AnC Bio Vermont GP Services, Jay Peak, Q Resorts, Quiros, and Stenger violated, and unless enjoined, are reasonably likely to continue to violate, Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Exchange Act Rule 10b-5(a), 17 C.F.R. § 240.10b-5(a).

## COUNT 50

### Section 10(b) and Rule 10b-5(b) of the Exchange Act
### (Against Biomedical Phase VII, AnC Bio Vermont GP Services, Jay Peak, Quiros, and Stenger)

313.    The Commission repeats and realleges Paragraphs 1-14, 26-56, 78-95, and 115-148 of this Complaint as if fully set forth herein.

314.    Defendants Biomedical Phase VII, AnC Bio Vermont GP Services, Jay Peak, Quiros, and Stenger, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails, made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading.

315.    By reason of the foregoing, Biomedical Phase VII, AnC Bio Vermont GP Services, Jay Peak, Quiros, and Stenger violated and, unless enjoined, are reasonably likely to

continue to violate Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Exchange Act
Rule 10b-5(b), 17 C.F.R. § 240.10b-5(b).

## COUNT 51

### Section 10(b) and Rule 10b-5(c) of the Exchange Act
### (Against Biomedical Phase VII, AnC Bio Vermont GP Services, Jay Peak, Q Resorts, Quiros, and Stenger)

316.   The Commission repeats and realleges Paragraphs 1-148 of this Complaint as if
fully set forth herein.

317.   Defendants Biomedical Phase VII, AnC Bio Vermont GP Services, Jay Peak, Q
Resorts, Quiros, and Stenger, directly or indirectly, by the use of any means or instrumentality of
interstate commerce, or of the mails, engaged in acts, practices, and courses of business which
have operated, are now operating and will operate as a fraud upon the purchasers of such
securities.

318.   By reason of the foregoing, Biomedical Phase VII, AnC Bio Vermont GP
Services, Jay Peak, Q Resorts, Quiros, and Stenger violated, and unless enjoined, are reasonably
likely to continue to violate, Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and
Exchange Act Rule 10b-5(c), 17 C.F.R. § 240.10b-5(c).

## COUNT 52

### Aiding and Abetting Biomedical Phase VII, AnC Bio Vermont GP Services, and Quiros' Violations of Section 10(b) of the Exchange Act and Rule 10b-5(b)
### (Against Q Resorts)

319.   The Commission repeats and realleges Paragraphs 1-14, 26-56, 78-95, and 115-
148 of this Complaint as if fully set forth herein.

320.   From no later than November 2012, Biomedical Phase VII, AnC Bio Vermont GP
Services, and Quiros each, directly or indirectly, by use of the means and instrumentalities of

interstate commerce, and of the mails in connection with the purchase or sale of securities, knowingly, willfully or recklessly made untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, in violation of Section 10(b) of the Exchange Act and Rule 10b-5(b), 15 U.S.C. § 78j(b) and 17 C.F.R. § 240.10b-5(b).

321.    Q Resorts knowingly or recklessly substantially assisted those three Defendants' violations of Section 10(b) and Rule 10b-5(b) of the Exchange Act.

322.    By reason of the foregoing, Q Resorts, directly or indirectly, violated, and unless enjoined, is reasonably likely to continue to violate, Section 10(b) and Rule 10b-5(b) of the Exchange, 15 U.S.C. § 78j(b) and 17 C.F.R. § 240.10b-5(b).

## XII. RELIEF REQUESTED

**WHEREFORE,** the Commission respectfully requests the Court find the Defendants committed the violations alleged, and:

### A. Temporary Restraining Order and Preliminary Injunctive Relief

Issue a Temporary Restraining Order and a Preliminary Injunction restraining and enjoining: (1) Quiros, Stenger, Jay Peak, Q Resorts, Stateside Phase VI, Jay Peak GP Services Stateside, Biomedical Phase VII, and AnC Bio Vermont GP Services from violating Section 17(a) of the Securities Act, and Section 10(b) and Rule 10b-5 of the Exchange Act; (2) Quiros from violating Section 20(a) of the Exchange Act; and (3) Quiros and Q Resorts from aiding and abetting violations of Section 10(b) and Rule 10b-5(b) of the Exchange Act.

### B. Permanent Injunctive Relief

Issue a Permanent Injunction restraining and enjoining: (1) all Defendants from violating Sections 17(a)(1) and (3) of the Securities Act, and Section 10(b) and Rules 10b-5(a) and (c) of

the Exchange Act; (2) Quiros, Stenger, Jay Peak, Q Resorts, Hotel Phase II, Jay Peak Management, Penthouse Phase III, Jay Peak GP Services, Golf and Mountain Phase IV, Jay Peak GP Services Golf, Lodge and Townhouses Phase V, Jay Peak GP Services Lodge, Stateside Phase VI, Jay Peak GP Services Stateside, Biomedical Phase VII, and AnC Bio Vermont GP Services from directly or indirectly violating Sections 17(a)(2) of the Securities Act and Section 10(b) and Rule 10b-5(b) of the Exchange Act; (3) Quiros from violating Section 20(a) of the Exchange Act; and (4) Quiros and Q Resorts from aiding and abetting violations of Section 10(b) of the Exchange Act and Rule 10b-5(b).

## C. **Conduct-Based Injunctive Relief**

Issue a Temporary Restraining Order, a Preliminary Injunction and Permanent Injunction restraining and enjoining Quiros and Stenger, at a minimum from directly or indirectly, including through any entity they own or control: (a) participating in the issuance, offer or sale of any securities issued through the EB-5 Immigrant Investor Program (provided, however, that such injunction would not prevent them from purchasing or selling securities for their own accounts); and (b) participating in the management, administration, or supervision of, or otherwise exercising any control over, any commercial enterprise or project that has issued or is issuing any securities through the EB-5 Immigrant Investor program.

## D. **Disgorgement**

Issue an Order directing all Defendants (except Stenger) and all Relief Defendants to disgorge all ill-gotten gains, including prejudgment interest, resulting from the acts or courses of conduct alleged in this Complaint.

## E. **Civil Penalty**

Issue an Order directing all Defendants to pay civil money penalties pursuant to Section

20(d) of the Securities Act, 15 U.S.C. § 77t(d), and Section 21(d) of the Exchange Act, 15 U.S.C. § 78(d)(3).

### F. Sworn Accounting

Issue an Order directing all Defendants except Stenger and all Relief Defendants to provide a sworn accounting of all proceeds received resulting from the acts/or courses of conduct alleged in this Complaint.

### G. Asset Freeze

Issue an Order freezing the assets of Defendants Quiros, Q Resorts, Stateside Phase VI, Jay Peak GP Services Stateside, Biomedical Phase VII, and AnC Bio Vermont GP Services and all Relief Defendants until further Order of the Court.

### H. Appointment of a Receiver

Appoint a receiver over Defendants Jay Peak, Q Resorts, Suites Phase I, Hotel Phase II, Jay Peak Management, Penthouse Phase III, Jay Peak GP Services, Golf and Mountain Phase IV, Jay Peak GP Services Golf, Lodge and Townhouses Phase V, Jay Peak GP Services Lodge, Stateside Phase VI, Jay Peak GP Services Stateside, Biomedical Phase VII, and AnC Bio Vermont GP Services, and all Relief Defendants.

### I. Records Preservation

Issue an Order restraining and enjoining all Defendants and Relief Defendants from, directly or indirectly, destroying, mutilating, concealing, altering, disposing of, or otherwise rendering illegible in any manner, any of the books, records, documents, correspondence, brochures, manuals, papers, ledgers, accounts, statements, obligations, files and other property of or pertaining to all Defendants and Relief Defendants, wherever located and in whatever form, electronic or otherwise, that refer, reflect or relate to the acts or courses of conduct alleged in this

Complaint, until further Order of this Court.

### J.  Officer and Director Bar

Issue an Order barring Defendant Quiros from and serving as an officer or director of any

public company pursuant to Section 20(e) of the Securities Act, Sections 21(d)(2) and 21(d)(5)

of the Exchange Act, and Section 305(b)(5) of the Sarbanes-Oxley Act.

### K.  Further Relief

Grant such other and further relief as may be necessary and appropriate.


Respectfully submitted,

April 12, 2016                                    By: s/Robert K. Levenson
                                                 Robert K. Levenson, Esq.
                                                 Senior Trial Counsel
                                                 Florida Bar No. 0089771
                                                 Direct Dial:  (305) 982-6341
                                                 Email:  levensonr@sec.gov


                                                 By: _____
                                                 Christopher E. Martin, Esq.
                                                 Senior Trial Counsel
                                                 SD Fla. Bar No. A5500747
                                                 Direct Dial: (305) 982-6386
                                                 Email: martinc@sec.gov

                                                 Attorneys for Plaintiff
                                                 SECURITIES AND EXCHANGE COMMISSION
                                                 801 Brickell Avenue, Suite 1800
                                                 Miami, Florida 33131
                                                 Telephone: (305) 982-6300
                                                 Facsimile: (305) 536-4154

JS 44 (Rev. 12/12)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

FILED by _____ D.C.

APR 12 2016

STEVEN M. LARIMORE
CLERK U.S. DIST. CT.
S. D. of FLA. – MIAMI

## I. (a) PLAINTIFFS
SECURITIES AND EXCHANGE COMMISSION

## DEFENDANTS
ARIEL QUIROS, WILLIAM STENGER, JAY PEAK INC., Q RESORTS, INC., JAY PEAK HOTEL SUITES L.P., et al.

**(b)** County of Residence of First Listed Plaintiff _____
*(EXCEPT IN U.S. PLAINTIFF CASES)*

County of Residence of First Listed Defendant   MIAMI-DADE
*(IN U.S. PLAINTIFF CASES ONLY)*

NOTE:   IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*
Christopher E. Martin, Esq. (305) 982-6386
Securities and Exchange Commission
801 Brickell Avenue, Suite 1800, Miami, FL 33131

(Broward Key West)

16-21301-CV-Gayles

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

☒ 1   U.S. Government
Plaintiff

☐ 3   Federal Question
*(U.S. Government Not a Party)*

☐ 2   U.S. Government
Defendant

☐ 4   Diversity
*(Indicate Citizenship of Parties in Item III)*

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff and One Box for Defendant)*
*(For Diversity Cases Only)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

MAGISTRATE JUDGE
TURNOFF

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 422 Appeal 28 USC 158 | ☐ 375 False Claims Act |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 365 Personal Injury - Product Liability | ☐ 690 Other | ☐ 423 Withdrawal 28 USC 157 | ☐ 400 State Reapportionment |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | ☐ 367 Health Care/ | | | ☐ 410 Antitrust |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & | Pharmaceutical | | **PROPERTY RIGHTS** | ☐ 430 Banks and Banking |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | Slander | Personal Injury Product Liability | | ☐ 820 Copyrights | ☐ 450 Commerce |
| ☐ 151 Medicare Act | ☐ 330 Federal Employers' Liability | ☐ 368 Asbestos Personal Injury Product | | ☐ 830 Patent | ☐ 460 Deportation |
| ☐ 152 Recovery of Defaulted Student Loans | ☐ 340 Marine | Liability | **LABOR** | ☐ 840 Trademark | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| (Excludes Veterans) | ☐ 345 Marine Product Liability | **PERSONAL PROPERTY** | ☐ 710 Fair Labor Standards Act | **SOCIAL SECURITY** | ☐ 480 Consumer Credit |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 370 Other Fraud | ☐ 720 Labor/Management Relations | ☐ 861 HIA (1395ff) | ☐ 490 Cable/Sat TV |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle Product Liability | ☐ 371 Truth in Lending | ☐ 740 Railway Labor Act | ☐ 862 Black Lung (923) | ☒ 850 Securities/Commodities/ Exchange |
| ☐ 190 Other Contract | ☐ 360 Other Personal Injury | ☐ 380 Other Personal Property Damage | ☐ 751 Family and Medical Leave Act | ☐ 863 DIWC/DIWW (405(g)) | ☐ 890 Other Statutory Actions |
| ☐ 195 Contract Product Liability | ☐ 362 Personal Injury - Medical Malpractice | ☐ 385 Property Damage Product Liability | ☐ 790 Other Labor Litigation | ☐ 864 SSID Title XVI | ☐ 891 Agricultural Acts |
| ☐ 196 Franchise | | | ☐ 791 Employee Retirement Income Security Act | ☐ 865 RSI (405(g)) | ☐ 893 Environmental Matters |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | | **FEDERAL TAX SUITS** | ☐ 895 Freedom of Information Act |
| ☐ 210 Land Condemnation | ☐ 440 Other Civil Rights | **Habeas Corpus:** | | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 896 Arbitration |
| ☐ 220 Foreclosure | ☐ 441 Voting | ☐ 463 Alien Detainee | | ☐ 871 IRS—Third Party 26 USC 7609 | ☐ 899 Administrative Procedure Act/Review or Appeal of Agency Decision |
| ☐ 230 Rent Lease & Ejectment | ☐ 442 Employment | ☐ 510 Motions to Vacate Sentence | | | ☐ 950 Constitutionality of State Statutes |
| ☐ 240 Torts to Land | ☐ 443 Housing/ Accommodations | ☐ 530 General | | | |
| ☐ 245 Tort Product Liability | ☐ 445 Amer. w/Disabilities - Employment | ☐ 535 Death Penalty | **IMMIGRATION** | | |
| ☐ 290 All Other Real Property | ☐ 446 Amer. w/Disabilities - Other | **Other:** | ☐ 462 Naturalization Application | | |
| | ☐ 448 Education | ☐ 540 Mandamus & Other | ☐ 465 Other Immigration Actions | | |
| | | ☐ 550 Civil Rights | | | |
| | | ☐ 555 Prison Condition | | | |
| | | ☐ 560 Civil Detainee - Conditions of Confinement | | | |

## V. ORIGIN *(Place an "X" in One Box Only)*

☒ 1   Original
Proceeding

☐ 2   Removed from
State Court

☐ 3   Remanded from
Appellate Court

☐ 4   Reinstated or
Reopened

☐ 5   Transferred from
Another District
*(specify)*

☐ 6   Multidistrict
Litigation

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
15 U.S.C. §§ 77q(a)(1), 77q(a)(2), 77q(a)(3), 78j(b), 78t(a); 17 C.F.R. §§ 240.10b-5(a), 240.10b-5(b), 240.10b-5(c)

Brief description of cause:
Violations of the federal securities laws.

## VII. REQUESTED IN COMPLAINT:

☐ CHECK IF THIS IS A CLASS ACTION UNDER RULE 23, F.R.Cv.P.

**DEMAND $**
TRO, Prel. Inj., Permanet Inj. ,

CHECK YES only if demanded in complaint:
**JURY DEMAND:**   ☐ Yes   ☒ No

## VIII. RELATED CASE(S) IF ANY
*(See instructions):*

Sworn accounting, Asset Freeze, Disg., Civil Penalty

JUDGE _____   DOCKET NUMBER _____

DATE   4-12-16

SIGNATURE OF ATTORNEY OF RECORD   *Christopher E. Martin*

**FOR OFFICE USE ONLY**

RECEIPT # _____   AMOUNT _____   APPLYING IFP _____   JUDGE _____   MAG. JUDGE _____